**Clarence Lee BRANDLEY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 68850.**

Court of Criminal Appeals ofTexas, En Banc.

May 8, 1985.

Rehearing Denied June 6, 1985.

George W. Morris, Donald M. Brown, Conroe, Percy Foreman, Mike DeGeurin, Houston, for appellant.

James H. Keeshan, Dist. Atty., Conroe, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

A jury found appellant guilty of capital murder and answered the special issues under Art. 37.071(b), V.A.C.C.P. affirmatively, whereupon the court assessed the mandatory penalty of death. Appellant raises fifteen grounds of error, including a challenge to the sufficiency of the evidence to support the verdict of guilt.

█ Appellant also challenges the sufficiency of the evidence adduced at a previous trial of the same offense. That trial resulted in a mistrial when the jury could not reach a unanimous decision on guilt or innocence. Appellant contends that the retrial violates his due process and double jeopardy rights under the United States and Texas Constitutions because the evidence at the first trial was insufficient to support a verdict of guilt. In *Richardson v. United States*, — U.S. —, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984), the defendant raised a double jeopardy claim after his first trial resulted in a mistrial due to the inability of the jurors to agree. The defendant argued that the evidence presented at the first trial was insufficient and that retrial was therefore barred by *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). The Supreme Court disagreed, holding that jeopardy does not terminate when the jury is discharged because it is unable to agree, and that, therefore, the sufficiency of the evidence presented at the first trial need not be reviewed.

Under the authority of *Richardson*, supra, we will not review the sufficiency of the evidence presented at appellant's first trial.

Appellant also challenges the sufficiency of the evidence presented during the instant trial.

The evidence is circumstantial. The victim was the sixteen-year old manager for the Bellville High School girls' volleyball team. She, the players, and the coach arrived at Conroe High School at 9:10 a.m. on Saturday, August 23, 1980 for a scrimmage; they entered an annex gym to begin warming up before their scheduled match. The victim put down the volleyballs, the scorebook, and her purse, and left the gym. Her body was found in the loft area above the stage in the auditorium at about 11:30 a.m.; she had been raped and strangled.

Gary Acreman, Henry Peace, John Sessum and Sam Martinez were janitors who worked at Conroe High School on August 23, 1980. Sessum did not testify. The other three testified to substantially the same facts. They had arrived at the school close to 7:30 a.m. Their supervisor, appellant, arrived about ten minutes late, around 7:40. Appellant unlocked the doors to the main building and directed all the janitors except Peace to set up chairs in the cafeteria. Appellant told Peace to spray-buff the teacher's lounge, and helped him to carry the buffer up to the lounge. Acreman, Sessum, and Martinez finished setting up the chairs between 9:00 and 9:30. They left the cafeteria and waited for appellant in the hallway between the auditorium and the cafeteria. While there, they saw a girl matching the victim's description come from the gym area, walk up the stairs, and go into the restroom near the auditorium.

Appellant followed behind the girl by a few minutes, carrying rolls of toilet paper in his hands. As appellant started up the stairs toward the restroom, Acreman told him a girl was inside. Appellant said he

was not going to go in, and told the three janitors to get Peace and go across the street to the vocational building; he would be there in a little while. Appellant then entered a janitor's closet near the restroom.

The three janitors left. They met Peace as he was coming out of the teacher's lounge, and all four walked across the street to the vocational building. The building was locked; they waited for appellant, who had the keys.

After about forty-five minutes, appellant appeared at one of the doors of the main building with a white towel draped around his neck. He called to Peace to come get the keys from him, saying that he had something to take care of. The janitors then set up the chairs in the vocational building, taking thirty to sixty minutes. Appellant then arrived to check the work. It was a little after 11:00 a.m. Appellant told Acreman and Martinez that they could go home and that they would be paid for a full day's work. Peace was to give appellant a ride home, so he walked back over to the main building with appellant, who checked to make sure the doors were locked.

Peace went with appellant while he checked the teacher's lounge and the cafeteria to be sure they were set up satisfactorily. Hearing some girls calling someone's name, they walked out into the hallway, and appellant asked the girls for whom they were looking. They described the victim, and appellant told Peace that they should look for her.

Peace noticed that an outside door near the auditorium and a door leading into the auditorium were open; appellant suggested they look inside the auditorium. Appellant told Peace to look in a loft above the stage where props were stored, and said he would look around the seats. Peace went up, looked halfheartedly, and came back down. Appellant asked Peace if he had "checked it out real good" and told him to go up and look again. Peace complied and moved a few things around but found nothing. The two then left the auditorium and looked in a few other places.

Appellant suggested they look in the auditorium again and, for the third time, he told Peace to go up to the loft area and look. This time, however, appellant accompanied Peace to the loft to help him look. Appellant told Peace once again to look "real good." When Peace picked up a piece of plywood leaning up against a door to the roof he saw the nude body of the victim on the floor. Peace screamed and called appellant, who told him to stay there and that he would get the police. Appellant left and returned with police officers.

Peace testified that the police searched his car and found a pistol, a paring knife, a zip-cut knife used to cut bandages, and a wooden club that some students had made for him. He testified that he had lied at the first trial when he had stated that he had shown David Harris a picture of his pistol and that in fact he had shown Harris the gun itself. He also testified that he had a card with his picture that indicated that he was a narcotics officer. Peace said that he had had a bunch of cards made up at a flea market and that he used them in a play world which he had set up at home to play with his nieces and nephews.

Additional evidence adduced at trial included testimony that in May of 1980 drama students at Conroe High School had tied a white towel to one of the ropes of a pulley system in the loft of the auditorium. Acreman testified that after the janitors had waited at the vocational building for forty-five minutes, appellant had appeared at the doors of the main building with a white towel draped around his neck. Testimony established that on August 23, 1980 the white towel was not in the loft.

Danny Taylor, a high school student who worked during the summer as a janitor, testified that he, appellant, and a few other people were standing near the teachers' lounge one day early in the summer, when a group of female students walked by them. Taylor said that appellant remarked that "if he got one of them alone, ain't no telling what he might do."

Appellant called several witnesses to show that many others had master keys that would open the auditorium doors and that the doors near the stage leading outside had at times been propped open with a two-by-four. An expert called by appellant testified that he examined the various hairs submitted for comparison, and that he did not find any that matched hair taken from Henry Peace; he did find hairs similar enough to appellant so that appellant could not be excluded. Appellant did not testify.

Hartwell Brown, the assistant principal at Conroe High School, testified that he was in charge of the auditorium, scheduling events and renting it to groups. The day before the murder, the auditorium had been set up for an in-service teachers meeting scheduled for Monday, August 25. After the preparations were finished, Brown personally checked all the doors in the auditorium except the one leading from the roof to the loft. He locked any door that was not locked, including a door leading to the outside which had to be slammed shut in order to lock. All the doors were locked when he left at 2:30 p.m. on Friday, August 22.

Doctor Joseph Jachimczyk, Chief Medical Examiner for Harris county, testified that the victim had been raped and strangled. He tested for and found seminal fluid in and around the vaginal area. There was a depression in her neck area 1–1/4 inches wide, which Jachimczyk testified was consistent with the use of a strap, belt, or towel of that width to strangle the victim. Appellant's belt was introduced into evidence; it measured 1–1/4 inches wide. Jachimczyk testified that urine accumulates at the rate of one ounce every fifteen minutes. The victim's bladder was empty, indicating that urine had just been eliminated.

Officer Kremenak, a member of the Conroe Police Department, testified that on August 25 he searched the dumpsters located behind the Conroe High School buildings and found a yellow plastic garbage bag similar to those used in the trash cans in the school. The bag contained the victim's shoes, belt, panties, shirt, jeans, and part of her bra. A string similar to a strand of mop string was found in the blue jeans.

Tony Arnold, a chemist-toxicologist from the Department of Public Safety laboratory in Austin, testified that he was experienced in the identification and analysis of hairs and fibers. He testified that he could exclude as "donor" persons whose hair did not match the characteristics of the sample to which he was comparing.

Various hairs were found on the victim and her clothing. Some were similar to appellant's, some not so similar. The evidence with regard to hair samples is inconclusive.

The standard for reviewing the sufficiency of the evidence on appeal is the same for direct and circumstantial evidence. *Carlsen v. State,* 654 S.W.2d 444 (Tex.Cr.App. 1983). That standard is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Carlsen,* supra at 449. The evidence must be viewed in the light most favorable to the verdict. However, in the first trial of this case the jury did not reach a verdict; therefore we will examine all the evidence to determine whether the evidence would be sufficient to support a verdict of guilty. We apply this standard by determining whether the evidence supports an inference other than the guilt of the appellant. *Carlsen,* supra.

"[I]n a circumstantial evidence case the State is not required to prove to a moral certainty that the circumstances presented actually exclude *every* hypothesis that the criminal act may have been committed by another person; it must only exclude every *reasonable* hypothesis raised by the evidence that would tend to exculpate the accused .... it is enough that the conclusion of guilt is warranted by the combined and cumulative force of all the incriminating circumstances." *Vargas v. State,* 669 S.W.2d 741 (1984). If the evidence presents such a reasonable hypothesis and the State does not disprove it, then the accused has not been proved guilty

beyond a reasonable doubt. *Carlsen*, supra.

■ Appellant was the only janitor whose time was unaccounted for during the critical period when the victim disappeared, and the victim was last seen near in time and in place to where appellant began his solo labor. Appellant's belt matched the strangulation marks on the victim. Appellant was aware of the victim's presence. Appellant was the only one of five janitors with keys to the auditorium, although there was testimony that Peace at one time had a master key that would open the auditorium. There is no evidence that anyone else who had keys and access to the auditorium was even at the school on the morning of the murder. The doors to the auditorium were unlocked when appellant and Peace looked inside, and the victim's body was found in the loft in the auditorium. The microscopic examination of hairs found on the victim's body and clothes were found in a yellow plastic garbage bag like those to which appellant had easy access. A mop string was found in the victim's jeans; mops were kept in the janitors' closets, one of which was near the restroom that the victim was seen entering.

No reasonable hypothesis is presented by the evidence to even *suggest* that someone other than appellant committed the offense. The evidence is sufficient to sustain the guilt of appellant. The ground of error is overruled.

Appellant contends that veniremember Matchett was improperly excused for cause in violation of both the Sixth and Fourteenth Amendments to the United States Constitution and of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The record contains a rather confusing discussion between Matchett and the attorneys concerning the procedure at the punishment stage of trial. Matchett initially expressed her opposition to the death penalty. The prosecutor explained the punishment phase of a capital murder trial and Matchett, while equivocating somewhat, stated that she had a very strong opinion against the death penalty and said there were no facts under which she would answer the first two punishment questions "yes" because it would result in the assessment of the death penalty. Defense counsel then re-explained the procedure at the punishment phase, stressing that the judge, and not the jury, assesses the death penalty if the jury answers the punishment questions "yes." Matchett then said that in a proper case she thought that she could follow the law and answer the two questions "yes." She added that she would not want to be the one "that would do something," apparently meaning impose the death penalty.

The prosecutor once again questioned Matchett and the source of her confusion became evident:

PROSECUTOR: The law says if the jury answers both of them "yes", he [judge] must assess the death penalty. He's got no choice at all. Do you understand that?

MATCHETT: No, I thought he [defense counsel] said that if you answered both of those "yes" that it would be left up to the Judge.

The prosecutor again explained the punishment procedures including the fact that the judge *must* assess death if the jury answers "yes" to the special issues.

The prosecutor continued questioning Matchett:

Q. Okay. Imagine you are on a jury, where the death penalty might apply. You find the defendant guilty. Then you go to the punishment stage where you answer these two questions and the law says two "yes" answers cause the Judge to give the death penalty, would you always have to answer one of those questions "no" to keep him from getting the death penalty?

A. Well, I guess I'd say "yes". I'd have to, because I don't believe in death penalty. Is that what you want me to answer?

Q. If that's the way you feel.

A. That's how I feel.

Q. That's how you feel?

A. Yes, it is.

Q. And are you against the death penalty in every case?

A. Yes.

Q. Could you ever vote to give a person the death penalty?

A. No.

Q. So, could you ever, no matter what the evidence was, could you ever answer "yes" to both questions, which would amount to giving him the death penalty?

A. No.

Q. You could never, never answer "yes" to both questions?

A. Never. I could punish people in other ways, but never the death penalty.

Q. All right. So, if you took that oath to reach a true verdict according to the evidence, you'd have a real problem with that oath and with your feeling against the death penalty, wouldn't you?

A. Yes, I sure would.

. . . . .

Q. And you realize that two "yes" answers mean the death penalty. That's what the law says. You recognize that two "yes" answers—

A. Means the death penalty.

Q. Means the death penalty.

A. No, I wouldn't answer it then.

Q. You wouldn't ever answer—

A. I'd say "no."

Q. You'd say "no" every time?

A. Uh-huh.

Q. No matter what the evidence?

A. Yes, since you made it clear, I would.

Q. Okay.

A. Because I'd know what they were talking about.

■ We look to the record as a whole in reviewing a ruling on a challenge to a veniremember. Once Matchett understood the procedure at the punishment phase it was unequivocal that she could not and would not answer "yes" to the special issues in any case.

In *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) the United States Supreme Court examined the applicability of *Witherspoon*, supra, to the Texas statutory death penalty scheme and stated:

If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the Witherspoon doctrine when it excludes jurors · who are unable or unwilling to address the penalty questions with this degree of impartiality.

448 U.S. at 46, 100 S.Ct. at 2526. See also *Wainwright v. Witt*, —— U.S. ——, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

The trial court properly sustained the State's challenge for cause. The ground of error is overruled.

Appellant contends that the trial court erred in permitting Danny Taylor's testimony about appellant's remark, concerning high school girls, that "if he got one of them alone, ain't no telling what he might do."

Pursuant to appellant's motion in limine the prosecutors and defense attorneys conferred with the court in chambers regarding the admissibility of Taylor's testimony. The State informed the court what the testimony would be and stated that they offered it because it went to show motive and the propensity of appellant in this circumstantial evidence case. Appellant objected on the grounds that the evidence was irrelevant, immaterial and prejudicial. The court ruled that the testimony was admissible. Appellant objected again during the trial when Taylor testified.

■ The State argues that this statement was properly admitted because it was not an extraneous offense and it tended to show appellant's intent and motive, both of which were relevant. Initially we note that the extraneous matter need not constitute an *offense* in order to fall under the extra-

neous transaction rule. The established rule in this area applies to extraneous transactions which include but are not limited to acts which are offenses. See *Sanders v. State*, 604 S.W.2d 108 (Tex.Cr.App. 1980).

In *Williams v. State*, 662 S.W.2d 344 (Tex.Cr.App.1983) this Court clarified the test for the admissibility of extraneous transactions. The two step test requires a " 'showing by the prosecution both that the transaction is *relevant* to a *material* issue in the case; and, the relevancy value of the evidence outweighs its inflammatory or prejudicial potential.' " 662 S.W.2d at 346. (emphasis in original). Further, we stated that "[i]n a circumstantial evidence case, admissibility as part of the state's direct evidence depends on the transaction's relevance to a material issue which the state must prove." 662 S.W.2d at 346.

The State contends that Taylor's testimony concerning appellant's comment tends to show his intent, which was a material issue. The State also argues that the remark shows appellant's motive, which goes to the material issue of identity. We must determine whether the statement tends to prove that appellant caused the death of the victim or that, if he did, it was in the course of the alleged accompanying crime.

Extraneous transactions must be analyzed for relevance within the context of the facts and circumstances of the individual case. Evidence offered to show motive is admissible because it is evidence that can aid in proving that an accused committed the alleged offense. However, the proffered evidence "must fairly tend to raise an inference in favor of the existence of a motive on the part of the accused to commit the alleged offense." *Porter v. State*, 623 S.W.2d 374, 386 (Tex.Cr.App. 1981); *Foy v. State*, 593 S.W.2d 707, 708 (Tex.Cr.App.1980).

In *Foy*, supra, we held that prior extraneous misconduct committed against the victim of the offense charged was admissible to show motive for committing the offense charged. In *Foy*, specific transactions, directed against a specific person, the victim, were held admissible. In *Russell v. State*, 598 S.W.2d 238 (Tex.Cr.App.1980) numerous cases are set out concerning the admissibility of extraneous evidence regarding motive. In *Hughes v. State*, 563 S.W.2d 581 (Tex.Cr.App.1978) the defendant was tried for the capital murder of a police officer who had attempted to approach him. Evidence of a prior probated conviction was admissible as bearing upon the defendant's motive in avoiding apprehension by the police officer. See also *Porter*, supra. From these cases we see that extraneous transactions directed specifically toward a certain individual person as in *Foy*, supra, and extraneous transactions that create in the actor an animus toward or fear of a class of persons, as in *Hughes*, supra, can be relevant and admissible to show motive.

Appellant contends that Taylor's testimony about "a casual remark made to several co-workers about passing girls" cannot be construed as showing motive, is not relevant to anything in the case, and is prejudicial. But, the victim was a stranger to appellant, apparently never having encountered him previously. In this context, appellant's general statement to his co-workers about what he might do to female students if he ever "got one of them alone" takes on greater probative value.

Further, appellant's defensive theory was that Henry Peace had committed the offense. Through vigorous cross-examination of Peace and several other witnesses, appellant attempted to suggest that Peace was the perpetrator of the offense. Appellant's comment thus tends to link appellant rather than Peace to the crime by suggesting a motive for the seemingly random rape-murder, and demonstrates appellant's motive by showing his attitude toward a particular group of people—female high school students. The comment, when examined in the context of the seeming randomness of the rape and murder, is relevant as tending to show that appellant, and not Peace, took an unusually strong interest in persons like the victim.

The question then follows—does the probative value of the evidence outweigh its potential prejudicial effect? This is a close question; however, given the probative value of the comment in linking appellant to the offense, given the fact that the State relied entirely on circumstantial evidence, and given the relatively minor role of the testimony in comparison to the other voluminous testimony, we find that it does. To the extent that the comment can be classified as "locker room talk"—something almost any man or boy might have said—it is of little moment in prejudicing appellant as well as in proving his guilt. It is probative in helping to explain an otherwise seemingly random event and giving what strength it can lend to the other circumstances implicating appellant, at the same time serving as a rejoinder to appellant's attempt to paint Peace as the villain by showing that, although Peace may have his unusual attributes, the *relevant* preoccupation is that of appellant. The court properly admitted the evidence. The ground of error is overruled.

Appellant contends that the court erred in excluding from evidence certain items found by police during a search of Henry Peace's car.

Peace testified that he consented to a search of his car by police on August 23. He stated that he had the following items in his car: a gun, a wooden club, a paring knife, and a knife used to cut bandages off. Peace also testified that he carried a laminated card that indicated that he was a narcotics officer. The court ruled that appellant could not introduce the gun, the club, or a set of handcuffs that were also found in the car, into evidence, or exhibit them in the presence of the jury. Testimony was admitted as to all but the handcuffs.

 Appellant's defensive theory was that Peace had murdered the victim. Ap-

pellant argues that an accused should be allowed wide latitude in establishing reasonable hypotheses in a circumstantial evidence case and that he should have been permitted to exhibit the excluded items before the jury. Testimony established exactly what was found in Peace's car, except for the handcuffs. The error, if any, is harmless at best.

Appellant also contends that the court "erred in holding evidentiary hearings in chambers during the trial of the case, thereby denying Appellant a public trial." The trial objection and appellant's brief are addressed, not to the holding of the hearings in chambers, but rather to the refusal of the trial court to allow appellant to make a bill of exception in the courtroom out of the presence of the jury. Appellant's specific complaint is that the court denied his request to make a bill of exceptions in the courtroom. We will address only the specific complaint which was properly preserved for review.

The setting for the action of which appellant now complains is important. During the trial before the jury, appellant objected to a question by the prosecutor pertaining to the probable cause for appellant's arrest. The court and attorneys discussed the matter in chambers. After a lunch break, the discussion resumed at the bench. The court overruled appellant's motion for mistrial which was based upon the prosecutor's question. Defense counsel then said, "I want to do our bill in Open Court." [sic][1] The court denied the request.[2]

The court overruled his objection regarding the bill of exceptions and the bill was made in chambers.

"The purpose of a bill of exceptions is to have the record disclose some event or occurrence at the trial or other proceedings which reflects error, Articles 40.09, subd. 6(a); 36.20, Vernon's Ann.C.C.P., ..." *McCall v. State*, 512 S.W.2d 334 (Tex.Cr.

---

**1.** It appears that appellant meant in the courtroom outside the presence of the jury by his use of the term "Open Court."

**2.** This bill apparently pertained to a previous ruling of the court regarding the admissibility of certain exhibits. Earlier in the day, the court had told defense counsel to wait and make the bill of exceptions at noon time.

App.1974). The bills are done for appellate purposes, not for trial purposes. A bill of exceptions is evidence that is included in the record for appellate purposes only and is not shown to the jury. The trial court has already ruled on the admissibility of the evidence which is the object of the bill. The bill of exception is made to perfect the record and preserve the alleged error.

The concerns addressed by both this Court and the United States Supreme Court in regard to a defendant's right to a public trial and the public's right of access to trial do not apply to a bill of exceptions. See *Houston Chronicle Pub. Co. v. Shaver*, 630 S.W.2d 927 (Tex.Cr.App.1982); *Gannett v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Waller v. Georgia*, ── U.S. ──, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984). "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, ..." *Gannett*, supra, 443 U.S. at 380, 99 S.Ct. at 2905, (Quoting 1 Cooley, Constitutional Limitations 647 (8th ed. 1927). A public trial not only ensures that the judge and prosecutor act responsibly, but it also encourages witnesses to come forward and discourages perjury. *Waller*, supra, ── U.S. at ──, 104 S.Ct. at 2215. These concerns are not in any way effectuated or promoted by the making of a bill of exception in the courtroom, out of the presence of the jury, about a matter upon which a judge has already ruled. In contrast to a bill of exception, compare a hearing on the admissibility of a confession or the admissibility of evidence. The court hears evidence before ruling on the issue. The hearing has many attributes of a trial and the concerns and policies that underlie a public trial are also present in such hearings.

Further, under Art. 40.09, subd. 6 and Art. 36.20, V.A.C.C.P. a bill of exceptions, in the discretion of the trial court, may be presented in writing, may be in narrative form, or may be made after trial. The methods approved for making a bill of exceptions, and the purpose served by the bill itself, operate against the conclusion that a bill should be designated part of the proceedings of a public trial.

■■■ We hold that ordering a bill of exceptions to be offered in chambers does not violate appellant's right to a public trial under Art. 1, Sec. 10 of the Texas Constitution, the Sixth Amendment to the United States Constitution, or Art. 1.24, V.A.C.C.P.[3] The record before us—a public record—includes the evidence offered in appellant's bill. The ground of error is overruled.

Appellant contends that the court erred in overruling his motions for mistrial when the State asked Officer Koerner whether he had knowledge of the previous history of appellant that might have a bearing upon the instant case in regard to probable cause for charging appellant with the offense.

Defense counsel cross-examined Officer Koerner about the evidence and information that had been gathered as a basis for filing charges against appellant. After questioning him in some detail about the specific information known before the filing of the complaint defense counsel asked:

Q. Did anybody put any pressure on you to get somebody in jail, because school was fixing to start?

A. No, sir. I had no political pressure.

Q. Did you have any more evidence on Friday, when the complaint was filed against this Defendant than you had on Monday? To your knowledge.

A. Repeat your question.

Q. Did you have any more knowledge about this crime on Friday, when you

---

**3.** We note that if refusal to allow a bill of exception to be made in the courtroom constitutes a violation of a defendant's right to public trial under either Texas law or the United States constitution the remedy would be to remand the case and allow the bill to be made in the courtroom. See *Waller*, supra. We see no reason such a nunc pro tunc ceremony could not be performed; neither do we see any utility in its performance.

filed a complaint against this Defendant than you had the preceding Monday?

A. No, sir.

The State then sought to clarify Koerner's testimony:

Q. Now, you were asked about what information that you had as of Friday that you might have presented to the District Attorney with regard to probable cause for filing these charges in the complaint against this defendant. Now, listen to the question carefully and answer "yes" or "no". On Friday, the 29th of—as of Friday, August 29th, 1980, other than the facts that you had learned of this case at that time, about what happened at the high school, did you have knowledge of a previous history of this defendant that might have a bearing upon what happened—

BY MR. BROWN [defense counsel]: Objection, Your Honor.

BY THE COURT: Sustained.

BY MR. KEESHAN [prosecutor]: May we approach the bench, Your Honor.

BY THE COURT: Sustained, and ladies and gentlemen, you're to disregard, any of these questions or any responses at this point.

After much discussion out of the presence of the jury, defense counsel moved for mistrial contending that the court's instruction would not cure the error that had been committed by the asking of the question. The court overruled the motion.

Appellant also moved for mistrial on the ground that the asking of the question was prosecutorial misconduct because it was a violation of the court's instruction on appellant's motion in limine. The court also overruled this motion.

After much discussion in chambers the court permitted the prosecutor to ask the question in somewhat different words:

THE PROSECUTOR: I'm going to ask you this last question, and I want you [to] answer it just "yes" or "no". Aside from what Mr. Morris has questioned

you about, those matters, and aside from this DPS information upon the hairs you've just mentioned, did you have other information which formed part of the basis for filing of the complaint with Mr. Keeshan?

THE WITNESS: Yes, sir.

Appellant again moved for mistrial claiming that the question asked compounded the harm from the original question. The court overruled appellant's motion.

■ Appellant raised the probable cause issue first and questioned Officer Koerner about the details of the basis for filing a complaint against appellant. Appellant sought to show that the State had very little evidence on which they based the complaint. Following this questioning it was permissible for the State to clarify and explain the probable cause issue further. Appellant "opened the door" on the issue and under Art. 38.24, V.A.C.C.P. the State is permitted to complete the picture. See *Wintters v. State*, 616 S.W.2d 197 (Tex.Cr. App.1981); *Parr v. State*, 557 S.W.2d 99 (Tex.Cr.App.1977). In fact, the court limited the State's questioning perhaps even more than it could have. Indeed, no mention of prior offenses or prior arrests even appeared. The ground of error is overruled.

In six grounds of error, appellant contends that reversible error inhered in the prosecutor's arguments at the guilt-innocence stage and punishment stage of trial.

First, during argument at the guilt-innocence stage of trial the State, in discussing the testimony of Henry Peace when he discovered the victim's body said:

MR. WINFREE: Officer Naranjo may have asked, "Is she dead?", and Ickie trying to help went over and checked her pulse.

MR. BROWN: (OBJECTION) I'm going to object to that, Your Honor, there's no evidence that he said "Is she dead?" And he testified. I ask—

THE COURT: Objection is sustained.

MR. BROWN: We ask the Court to instruct the jury to disregard what he might have said.

THE COURT: Jury, disregard.

MR. WINFREE: (continuing) If it happened—when Naranjo had his turn, automatically would have said, "Is she dead?" Naranjo didn't touch her himself, remember that?

MR. BROWN: (OBJECTION) I'll object to that. He testified fully—he never testified—in fact, he denied ...

MR. KEESHAN: Your Honor, it's a logical deduction from the evidence that an officer might ...

THE COURT: Overruled.

Peace testified that one of the officers asked him to check the victim's pulse. The officers denied doing so. Whether the prosecutor's argument is a logical deduction made from this conflicting testimony, we need not decide because we do not perceive, nor does appellant mention, any harm that possibly occurred due to this argument. The argument did not even concern appellant and in no way reflected harm or prejudice upon him. The ground of error is overruled.

Appellant alleges that the court erred in overruling his objection to another argument concerning Henry Peace made at the guilt-innocence stage. The prosecutor was discussing the fact that appellant sent Peace up to the loft three times to look for the missing girl:

MR. KEESHAN: You know that he [Peace] must have told Mr. Collier how many times he'd been up there or these men wouldn't ...

MR. BROWN: (OBJECTION) Your Honor, there's no evidence he told Mr. Collier how many times. Mr. Collier did not testify to any conversation.

The court overruled appellant's objection.

During the trial the prosecutor asked Mr. Collier: "Did he [Peace] have occasion to tell you how many times he had gone to look for the body?" Mr. Collier answered "Yes sir. He did." Appellant now contends that asking how many times he had been "up there" and how many times he

had looked for the body are two separate and distinct questions and that the former comment, stated during argument, injects new evidence into the case. We disagree.

The reference in both questions, given the context within which they were asked, was to the number of times appellant had told Peace to look in the loft for the missing girl. The argument was not improper. The ground of error is overruled.

The next argument complained of, also made during the guilt-innocence stage, dealt with appellant's employment at a funeral home. During the trial, Texas Ranger Wesley Styles testified that he went to a funeral home which was one of appellant's places of employment. No other information was elicited about this employment. The prosecutor argued to the jury:

MR. KEESHAN: An important part or piece of evidence that we haven't gone into much, another important part is the fact that this defendant worked at a funeral home. We have not gone into that very much but you know that Wesley Styles, the Texas Ranger, said he went by and verified his employment at the Collins and Johnson Funeral Home and Dr. Jachimczyk told you from the medical evidence that it appeared that this girl had been molested after she was dead or unconscious. We know also that the person who committed this offense had to have stayed with that body—

MR. MORRIS: (OBJECTION) Your Honor, we are going to object to this. This is inflammatory—just because of a job check does not give him rise to make this type of an inflammatory argument.

THE COURT: Overruled.

MR. KEESHAN: (continuing) Thank you, Your Honor. We know that whoever did this was not repelled by a dead body. Somebody stayed there and took the clothing off that body; somebody had intercourse with that body apparently after she was unconscious or dead. It is not just everybody who is going to be involved in that kind of offense ... This man was not repelled by the fact that she

was deceased. Furthermore, what else did we hear from Jim Schmidt? Jim Schmidt is the mortician from the Metcalf Funeral Home. He came by and was one of those persons who picked up [the victim's] body and he said—when you get a body with clothing on in the funeral home, one of the first things we do is take the clothing off and we put it where? In a bag. We put it in a bag. That's what happened in this case. Those are two more links in the chain. I submit that the person who did it was not repelled. And, also, following instinct or pattern or habit or whatever, the clothing was placed in a bag ....

The first part of the argument was based on testimony elicited during the trial. The argument was proper. In addition, it is not clear as to what appellant's objection was directed. Appellant seems to be objecting now to the inferences the State made in their argument from the fact that appellant worked at a funeral home. These inferences, made during the second part of the argument, that appellant was not repelled by death, were not objected to by appellant. The error, if any, in the second part of the argument was not preserved.

▇ Appellant also alleges that the argument constituted prosecutorial misconduct because it was made in bad faith. Appellant claims that evidence adduced at a hearing on appellant's amended motion for new trial on the issue shows that the prosecutor had been told by the owner of the funeral home that appellant was an odd-jobs handyman and was not involved in disrobing bodies, etc. However, the owner also testified that appellant had expressed an interest in becoming a mortician, was seen in the preparation room, had picked up and transported dead bodies, was frequently around dead bodies, and had never expressed any fear about being with dead bodies. The State argues that it would logically follow that one who was so employed was not repelled by dead bodies. Thus, their argument was proper and not made in bad faith. We agree that the argument was not made in bad faith in

light of the testimony given at the hearing on the motion for new trial. It is a reasonable deduction that one who works at a funeral home and is constantly around dead bodies is not repulsed by them. Since appellant did not object to this argument we do not comment on its propriety. The ground of error is overruled.

Appellant's next three grounds deal with allegedly improper argument at the punishment phase. First, appellant contends that the State struck at appellant over the shoulder of defense counsel. Defense counsel argued:

MR. BROWN: I would like to say this: that you and each of you took an oath on your God that you would a true verdict render in this case. And I'm telling you now that under the oath you took in this case, if you believe from the evidence that you've heard beyond a reasonable doubt and to a moral certainty, that there is no reasonable possibility that someone else could have committed this crime, you should assess the death penalty.

MR. KEESHAN: You Honor, ...

MR. BROWN: (continuing) And you know the other alternative, if your conscience bothers you at all because of your verdict. Thank you.

THE COURT: You may proceed.

MR. KEESHAN: Thank you your Honor. May it please the Court, ladies and gentlemen of the jury, it is not considered professional to attack the verdict of the jury or quarrel with the verdict
. . .

MR. BROWN: I object your Honor, there was no attack on the verdict. I said if they believe it they should assess the death penalty. That was my argument.

THE COURT: Okay. Over—Let's proceed.

▇ The intent of defense counsel's argument seems to have been to shame the jury which had convicted appellant into negative answers to the punishment issues. He essentially encouraged jurors to be lenient at punishment if they had second

thoughts *about the verdict of guilt*. The prosecutor's argument was a response to that attack on the verdict. No error is presented.

In addition, we note that from the record it appears as if the court started to rule on the objection but never did. Thus, appellant has not preserved anything for review.

Appellant contends that the following argument by the State at the punishment stage was improper:

MR. KEESHAN: Another consideration in the punishment phase is rehabilitation. I know all of you have heard of that. That's a popular term. And a popular consideration in young first offenders. I think it's a matter of common knowledge that young first offenders are normally given a second chance when they violate the law unless it's some atrocious crime. And rehabilitation is often then a factor for you to consider at the punishment phase. But this defendant from the evidence has had his opportunity for rehabilitation.

MR. BROWN: (OBJECTION) Your Honor, I object to his arguing about rehabilitation. It's not proper in this case. It's a life sentence or death penalty.

THE COURT: Overruled.

The prosecutor continued his argument stating that appellant had already had his opportunity for rehabilitation and ended up killing someone.

Appellant argues that the remark is prejudicial because "it is a suggestion that, through parole, the Appellant might get out some day if given a life sentence." The State contends that they were "merely arguing for affirmative answers to the special issues." They also argue that rehabilitation could apply to a person who was sentenced to life imprisonment. The State's argument is that appellant had already had his chance at rehabilitation and obviously failed, therefore, death was an appropriate penalty for him.

**4.** Appellant was not a first offender. At the time of the instant offense he was on probation

We agree that the import of the prosecutor's argument was that appellant had been given his opportunity to reform and had then raped and murdered a high school girl. Parole was never mentioned nor can it be said that a jury would infer that the comment related to parole. It is permissible for the prosecutor to argue that appellant had been previously convicted and yet had not been rehabilitated.[4] It is a reasonable deduction from the evidence. The argument was not improper. The ground of error is overruled.

Appellant's last contention involving punishment argument concerns the following:

MR. KEESHAN: I think you can see from the evidence, from some of the photographs, there is a look of stark terror in the photographs seen on her face. It is fair for you to think about the feelings of the father who lost his baby daughter and it is fair for you to think about how you would feel if you lost your children in considering ...

MR. BROWN: (OBJECTION) Your Honor, I object to his placing the jury in the shoes of the victim and the victim's family.

The court sustained appellant's objection, instructed the jury to disregard the statement, and overruled appellant's motion for mistrial.

Appellant contends that this was improper argument which inflamed the jury and thus prejudiced appellant. To be proper, argument must fall within one of the following four categories: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or, (4) plea for law enforcement. *Todd v. State*, 598 S.W.2d 286 (Tex.Cr.App.1980). The argument complained of does not fit into any of the four categories; it is rather a plea for abandonment of objectivity. We must consider whether it constitutes reversible error, that is, whether in light of the record

for a weapons offense.

as a whole the argument is extreme or manifestly improper, it is violative of a mandatory statute, or it injects new facts, harmful to the accused, into the trial proceedings. *Goocher v. State,* 633 S.W.2d 860 (Tex.Cr.App.1982); *Todd,* supra. Given the record as a whole and given the timely instruction to disregard, we find that the argument is not of the tenor to require reversal. Similar cases have found such argument to be harmless. See *Adell v. State,* 152 Tex.Cr.R. 152, 211 S.W.2d 575 (1948); *Patillo v. State,* 131 Tex.Cr.R. 393, 98 S.W.2d 825 (1937); *Liel v. State,* 129 Tex.Cr.R. 99, 83 S.W.2d 680 (1935). The ground of error is overruled.

■ Appellant next contends that he requested that the appellate record contain certain original exhibits and that the record instead contains copies of some of those exhibits, which were photographs, and a description in place of one of the exhibits, which was a plastic identification card belonging to Henry Peace. Appellant claims that the exhibits pertained to his defensive theory and that the original photographs and identification card are vital to show that theory. In some cases it will be important, even critical, that the original exhibits be included, and a copy will not suffice. In this case we have carefully reviewed the record including the exhibits and the description of the identification card. The copies in the record are adequate for the purposes of our review. No error is presented. See Art. 40.09, subd. 1. and Art. 44.11, V.A.C.C.P.

Finally, appellant contends that the court erred in refusing to allow appellant to recall Henry Peace for further cross-examination. The sequence of events leading up to the court's refusal must be set out in order to understand the context of the refusal. Appellant cross-examined Peace extensively. Officer Styles then testified as a State's witness. He testified that he interviewed Peace. It is apparent from appellant's cross-examination of Styles that he was aware that Styles taped his interview with Peace. It is also apparent from the cross-examination that appellant had a copy of Styles' offense report which contained Styles' transcription of the interview. Sometime later, after another witness had testified, appellant's counsel stated that "through Wesley Styles, a state witness, it was revealed for the first time that Mr. Peace made a statement to Wesley Styles ... at the police station ... in which he made certain statements about finding the body of [the victim], contrary to the way he testified in this case." Appellant's counsel stated for the record that he wanted to call Peace back for further cross-examination and that "[w]e object to the ruling of the Court in this regard." Up to this point the record does not contain any ruling by the court concerning this issue. There was further discussion concerning Peace's statement to Styles and the court then stated that Styles's report was not a statement because it was neither signed nor read by Peace, and was part of Styles' investigative work-product. Nothing further was offered by appellant pertaining to the statement. Appellant did not make a bill of exceptions showing the content of the statement or that it was exculpatory, as he now claims, neither did he in any way show that the "statement" was indeed a statement and not investigative work product.

■ The court's ruling that the statement itself was not admissible was proper. Appellant should have been permitted to recall Peace for the purpose of impeaching him and to ask him if he had made the particular "statement." If Peace admitted making the statement the impeachment would be complete. If Peace denied making the statement appellant could call Styles and ask him if Peace had made the statement.

However, since the record contains neither a ruling forbidding the recall of Peace nor a bill of exceptions showing what the cross-examination would reveal or the content of the statement was, no error is presented. See *Craig v. State,* 594 S.W.2d 91 (Tex.Cr.App.1980). The ground of error is overruled.

The judgment is affirmed.

CLINTON and TEAGUE, JJ., dissent.