**Debra Lee BROWN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 05–87–00160–CR.**

Court of Appeals of Texas,
Dallas.

March 7, 1988.

Following a trial before the court, appellant, Debra Lee Brown, was found guilty of misdemeanor theft. The trial court assessed punishment at confinement in the Dallas County Jail for 180 days, probated for six months, and a $300.00 fine. In the sole point of error, Brown contends that the State failed to prove her guilt beyond a reasonable doubt because the evidence presented did not exclude every other reasonable hypothesis except that of her guilt. We disagree and, accordingly, affirm the trial court's judgment.

The standard for appellate review of the sufficiency of the evidence in both direct and circumstantial evidence cases is

---

1. Justice Ed Kinkeade succeeded the Honorable John L. McCraw, Jr., Justice, upon Justice McCraw's resignation effective December 28, 1987, which was between the time the case was submitted and the time it was decided. Justice Kinkeade has reviewed the briefs and record before the Court.

whether, viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Houston v. State*, 663 S.W.2d 455, 456 (Tex.Crim.App.1984); *Wilson v. State*, 654 S.W.2d 465, 471 (Tex.Crim.App.1983). In analyzing the evidence in a circumstantial evidence case, this Court must determine whether the evidence supports a reasonable hypothesis other than the guilt of the accused. *Carlsen v. State*, 654 S.W.2d 444, 449 (Tex.Crim.App.1983). Utilizing this standard, we now review the evidence in this case.

Sherida Phillips, a teller supervisor at Wynnewood Bank, became concerned about cash shortages on transactions being handled by Brown. After four unusual shortages were reported within a two week period, Phillips reported her suspicions to supervisors. In order to test Brown, a plan of action was developed whereby an extra fifty dollars would be placed into a night deposit bag and this transaction would be assigned to Brown for handling. It was the bank's procedure that night deposits were handled by the tellers each morning prior to the opening of the bank. A teller was to count the money from the night deposit bag but was not to place the money into the cash drawer until the cash and checks in the bag matched the amount reflected on the deposit slip. If there was a problem, an overage or shortage, the supervisor was to be immediately notified. The supervisor in turn double checked the cash and deposit slip and notified the customer of any discrepancy. Four bank employees participated in placing an extra fifty-dollar bill into a night deposit of Revco. The employees verified and recorded by denomination the exact amount of cash in the Revco bag. At 8:30 a.m. on Friday, September 5, 1986, the Revco deposit was given to Brown. Because Brown had not reported any overage by 11:30 a.m., an audit was conducted. As the bank officers were waiting to conduct the audit, Beatrice Garrett, an internal auditor, observed a fifty-dollar bill sticking out the side of Brown's sandal. Brown was asked to remove her shoe and the bill fell to the floor.

Upon being asked whose money it was, Brown responded that it was hers. Brown refused to give the money to the bank personnel and instead pulled her purse from the right side of the cage and immediately placed the money into her purse. This surprised the auditors, since it was against the bank's policy to allow tellers to keep purses inside the booth.

In connection with the Revco deposit, the audit revealed that Brown reflected the proper number of fifty-dollar bills but changed the number of ten-dollar bills from forty to thirty-five, thereby decreasing the total deposit by fifty dollars. By the time the audit took place, Brown had handled several transactions and, therefore, the integrity of the Revco bag was not preserved. The final figures, after adding and subtracting the recorded transactions and determining the beginning balance, reflected that Brown was thirty cents short in her cash drawer instead of being fifty dollars over. Brown's behavior during the audit was unusual in that she did not stay in the area during the audit, but rather walked off and had to be summoned to return. After completing the audit, Brown signed a form which indicated all of the figures were correct.

When she was told that it would be necessary for her to go to Mike Kelley's office, Brown responded that she could not stay because she had to get her child from school. The police were notified of the theft at the conclusion of the audit. Brown returned to the bank approximately two hours later, and she immediately went to Kelley's office. Kelley explained to her that an extra fifty dollars had been placed into the Revco deposit and the money was unaccounted for in the audit. When Kelley asked Brown where the money was, she wanted to know if she was being accused of stealing from the bank. Kelley responded that she was, and when Brown offered no explanation, she was terminated. Brown stayed around the bank for a short period of time and finally left after being told that she could not obtain her payroll check that day.

The following Monday morning Brown returned to Kelley's office to discuss what she could do to get her job back. Kelley replied: "Debbie, I don't know of anything short of a miracle, that somebody, some customer of the bank, would come in here with that fifty dollars and good faith and convince us of it, you certainly would get your job back and an apology." Brown requested that she be provided an opportunity to review the audit tapes in an effort to figure out what had happened to the extra fifty dollars. Brown then left the bank.

A short time after Brown's discussion with Kelley and her leaving the bank, a man identifying himself as Winston Turner entered the bank and asked to speak to a teller supervisor. Turner explained to Phillips that he had been in the bank on Friday to exchange some old bills for new bills, and a teller had given him too much cash. Turner was not a regular bank customer and therefore could not identify the particular teller; however, he did indicate that the transaction occurred at the third window, which was where Brown had been working. Later that day, Phillips turned over to Garrett the fifty dollars and Turner's identification.

Brown returned to the bank later on Monday in order to review the teller tape. While examining the tape, Brown related to Garrett that a customer had come into the bank on Friday to exchange large bills for small bills, breaking a bunch of hundred-dollar bills into smaller ones. While Brown did not remember the exact customer, she speculated that she might have given him fifty dollars too much. When Garrett explained that such a cash transaction was not reflected on the teller tape, Brown responded that she had not made a record since it was an even exchange of cash. A number of the bank employees testified that each transaction handled at a teller's window is required to be reflected on the tape, even those involving an exchange of cash. As Brown was examining the tape, she asked Garrett if anyone had been to the bank to return the fifty dollars. At that time, Garrett was unaware that Turn-

er had been to the bank, and therefore she responded no.

Brown began testifying on January 23, 1987. At that time, in explaining the circumstances surrounding the fifty-dollar bill which was in her shoe, Brown initially stated that she did not remember exactly why she had that sum of money with her. In response to questions, Brown speculated that it might have been because she was about to go to lunch or because she sometimes handled transactions with friends with her personal money, "not on the bank." After a seven day recess, the trial resumed and during subsequent testimony, Brown explained that she had the money with her because she was about to make a car payment. According to Brown, the money kept falling out of her pocket, and she just put it in her shoe until she could take a break.

Brown also disputed the testimony concerning her actions when the fifty dollars was discovered. According to Brown, she gave the fifty-dollar bill to Garrett and Pearce, who in turn examined the money and returned it to her so that she could put it in her purse. It was her contention that no one had ever told her that she could not carry her purse into the cage area and further, that she had never been told to record each and every transaction on the teller machine. Brown testified that she commonly did an exchange of money without reflecting the transaction on the tape. In relating the conversations she had with Kelley on that Monday morning, Brown denied that she was told that she could get her job back if somebody brought back the money. Further, she denied asking Garrett if the money had been returned. Brown related, that she had remembered the exchange of old money for new money during her discussions with Kelley. Brown also discussed the possibility that she simply miscounted the money. While Brown insisted that she did not take the money and that this is the first time she had ever been accused of theft, she revealed on cross-examination that she had been terminated from Sunbelt National Bank because of shortages in her cash drawer. Brown

considered herself an experienced teller and had worked at ten banks since 1976.

Norman Bend, Brown's boyfriend, appeared on behalf of the defense. According to Bend, he did not know that she had returned to the bank on Monday in an effort to get her job back. Bend also stated that he did not know Turner and did not in any manner participate, ask someone to participate, or cause any money to be returned to the bank after Brown was fired.

The last witness to testify on behalf of Brown was Turner. It was Turner's testimony that on Friday, September 5, 1986, before going to the racetrack in Louisiana, he went to the bank and traded some twenties for two fifty-dollar bills and a hundred-dollar bill. According to Turner, he placed the money he received from the bank in his wallet and as he was placing his first bet, he realized that he had an extra fifty-dollar bill. Turner explained that he always keeps the "betting" money in his wallet and all other money in a front left pocket. Turner did not mention the extra fifty dollars to his wife, brother, or sister-in-law, although they were all with him at the races. Turner stated that he returned the money to the bank because his nephew was fired from a bank for shortages, and he did not want the same thing to happen to this teller. The testimony presented by Turner conflicts as to whether the teller counted the cash in his presence, but he was adamant that he did not count the money until he started to place a bet at the racetrack. Turner testified that he did not know the teller. It was Turner's testimony that he did not know Bend nor did he have a friend named Norman.

In rebuttal, Garrett testified that the correct procedure for a cash exchange as testified to by Turner would be for the teller to count the money handed to her a couple of times and enter it on her teller tape. The teller would then take the new money, counting it out of her drawer, then count it a second time to enter it on the teller tape, and count it a third time when handing it to the customer at the window. Garrett further testified that Brown was trained in such cash exchange procedures. Pat White, the personnel director at Wynnewood Bank, related that she had contacted Turner's home. Without objection, she related a conversation with Turner's daughter which inferred that Bend and Turner were friends.

Brown contends that the evidence presents a reasonable alternative to her guilt. As argued by Brown, everyone agrees that Turner came into the bank on Monday, September 8, 1986 and told Phillips that he had been given an extra fifty dollars the preceding Friday. Further, while he could not identify Brown by name, he could identify the teller window. Thus, according to Brown, it is reasonable to hypothesize that the fifty dollars missing from Brown's teller drawer was the same fifty dollars returned to the bank by Turner.

Certainly, the State must exclude every other reasonable hypothesis except that of Brown's guilt in order to sustain her conviction based upon circumstantial evidence. *Johnson v. State*, 673 S.W.2d 190, 195 (Tex. Crim.App.1984). However, the State need not disprove every imaginable scenario.

In order to accept Brown's *reasonable* hypothesis, we must believe that this experienced teller miscounted money at least twice between 8:30 a.m. and 11:30 a.m. First, she miscounted the number of ten-dollar bills in the Revco deposit, reducing the deposit by five bills, or fifty dollars. Second, she miscounted again when exchanging money for Turner. The transaction with Turner involved counting only three bills—one one-hundred-dollar bill and two fifty-dollar bills. If Brown followed Bank policy in the transaction with Turner, she miscounted even though she had counted the bills at least three times.

To bolster Brown's hypothesis that the fifty dollar shortage was due to accident rather than theft, we must believe that Turner's appearance, fulfilling the miracle requested by Kelley, was simply coincidence. We must believe that the money found in Brown's shoe was her money, placed there rather than in her conveniently-located purse for safekeeping. We must also ignore any inference of a friendship between Turner and Brown's boyfriend.

**262**

We conclude that Brown has presented no reasonable hypothesis which the State must disprove. A reasonable hypothesis is one consistent with the facts proved and the circumstances; a supposition out of harmony with the evidence will not merit an acquittal. *See Vaughn v. State,* 607 S.W.2d 914, 921 (Tex.Crim.App.1980); *Russell v. State,* 665 S.W.2d 771, 776 (Tex. Crim.App.1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984). Brown's hypothesis is out of harmony with the facts and circumstances proved. The State is not required to prove to a moral certainty that the circumstances presented actually exclude *every* hypothesis; it must only exclude reasonable hypotheses raised by the evidence. It is enough that the conclusion of guilt is warranted by the combined and cumulative force of all the incriminating circumstances. *Brandley v. State,* 691 S.W.2d 699, 703 (Tex.Crim.App. 1985); *Marmon v. State,* 704 S.W.2d 90, 92 (Tex.App.—Dallas 1985, pet. ref'd).

We conclude that Brown's hypothesis is far from reasonable. Further, the combined and cumulative force of all the incriminating circumstances supports the verdict of guilty. Therefore, we overrule Brown's single point of error and affirm the judgment of the trial court.