**Wallis JOSLIN, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 05–85–01222–CR.**

Court of Appeals of Texas, Dallas.

Dec. 1, 1986.

Rehearing Denied Dec. 31, 1986.

S. Michael McColloch, David W. Coody, Dallas, for appellant.

Michael A. Klein, Asst. Dist. Atty., Dallas, for appellee.

Before VANCE, DEVANY and CARVER,[1] JJ.

DEVANY, Justice.

Wallis Joslin, Jr., appeals his conviction for murder. The case was tried before a jury and appellant was sentenced to life imprisonment and fined $10,000. Appellant presents six points of error complaining

1. The Honorable Spencer Carver, Justice, retired, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

that the circumstantial evidence was insufficient and that the court should not have submitted jury instructions at the punishment phase of the trial regarding eligibility for parole and good time credit. Because we disagree with appellant's contentions, we affirm the judgment of conviction.

## THE INSUFFICIENCY QUESTION

In his first point of error, appellant complains that the evidence is insufficient to support a verdict of guilty. The evidence presented by the prosecution was quite detailed. On March 31, 1985, the victim, twenty-nine-year-old Darla Taylor, was preparing omelettes for dinner with her father. Needing more eggs and bacon, she went to the local Safeway store, which was just two minutes away. She told her father where she was going and left her home at about 6:35 p.m. She drove a new maroon Lincoln Town car that belonged to her father.

At about 7:00 p.m., Darla Taylor was seen in the Safeway store near her home by a Mr. Burleson. He subsequently remembered her after a picture of her appeared in a newspaper account of her murder. While Mr. Burleson was in the store, his wife was waiting outside in their brand-new Chrysler New Yorker. While she was waiting for her husband, Mrs. Burleson observed the appellant standing outside the Safeway store, "pacing back and forth ... like a caged animal." Appellant was watching people inside the store. As each person left, appellant watched. He did not go into the store during the entire twenty minutes that Mrs. Burleson was watching him. At one point, appellant approached Mrs. Burleson's car, and she "got scared ... locked the car and turned on the ignition." Appellant then stared at her, turned his back, and walked away. When Mr. Burleson returned to the car, she said to him, "He [appellant] scared me. He doesn't go into the store, and he keeps looking at people, Joe. I'm afraid he's going to rob somebody. That man is fixing to hurt somebody or something." Appellant was wearing a pair of jeans, tennis shoes, a cloth jacket, and a black cap. Mr. and Mrs. Burleson later reported this story to the police and each identified appellant from a photographic lineup.

Darla Taylor did not return home from the Safeway store. The sun set at 6:47 p.m. on March 31, making it totally dark by 7:45 p.m. Shortly before dark, the appellant was seen driving a maroon Lincoln Town Car with tinted windows identical to the one driven by Darla Taylor. He drove in and later out of the Willow Tree apartment complex where he lived, and waved at his friend Sherry Riddle. Kenneth Riddle, the brother of Sherry Riddle, also saw the maroon Lincoln Town car parked directly outside appellant's apartment for a few minutes at about the same time. The testimony revealed that no other car of this type had ever been parked in front of appellant's apartment before. After the car left the complex, it was not seen again until it was found burning in the parking lot of the Tree Top Apartments, which were very close to the Willow Tree Apartments where appellant and the Riddles lived. The car was found at 2:46 a.m., about six or seven hours later burning from the inside. No personal items of any kind were found inside the car except a sack of groceries containing two bottles of Coca Cola, a carton of Lucerne eggs, which is a Safeway brand, and some bacon. Appellant did not return home to the apartment where he lived with his sister and brother-in-law until 1:30 a.m., just prior to the discovery of the car burning.

Earlier during the day of the murder, appellant's brother-in-law had discovered his .22 caliber pistol, which he kept in a camouflaged holster, was missing. Appellant knew where the pistol was kept. The camouflaged holster was later found in the wooded area between the Tree Top and Willow Tree Apartments. A butane cigarette lighter, similar to the one used by the appellant, was also found in the wooded area. On April 5, 1985 Darla Taylor's body was found in a wheat field eight to eleven minutes driving time away from the Safeway store where she was last seen alive.

She had been shot once in the chest and once in the head. The blood stains, gunshot residue, and other medical evidence indicated that she had first been shot in the chest from a distance of six to twelve inches, had run from her assailant for some 240 yards, and had then been shot in the head from a distance of three to four feet. Two bullet fragments were recovered from Darla Taylor's body. No other physical injuries were apparent.

Testimony revealed that after the news of the murder appeared, appellant was smoking marijuana and watching the news with friends. According to Sherry Riddle, he was cheerful and talkative until a news story about the murder came on television. She said that everyone else was talking about the murder, but appellant suddenly grew pale and quiet and had nothing to say.

Appellant was arrested on April 8, 1985 at 9:20 p.m. After being tipped off by appellant's brother-in-law, the police found appellant hiding in a built-in clothes hamper of a vacant apartment that was adjacent to the apartment where appellant lived with his sister and brother-in-law. Appellant had cut a hole in the wall of a bedroom closet in order to gain access to the vacant apartment.

Earlier in the evening of the arrest, appellant's brother-in-law had talked to appellant through the wall and tried to convince him to give himself up. Appellant told his brother-in-law that he was too scared of the police to turn himself in. Appellant's brother-in-law told him that the police believed appellant was armed and dangerous. Appellant asked his brother-in-law to get him some women's clothes so he could disguise himself and escape. Appellant's brother-in-law denied the request and then phoned the police to inform them of appellant's whereabouts.

When appellant was arrested, the police found an empty package of Saratoga cigarettes in the trash at the vacant apartment. Darla Taylor's mother, who smoked Saratogas, often kept a package of Saratoga cirgarettes in the Lincoln Town Car.

The police later searched the apartment where appellant had lived with his sister and brother-in-law. In the living-room desk where appellant kept some of his personal belongings, the police found a box of cartridges containing copper-coated .22 caliber bullets. The appellant's brother-in-law had mixed two different kinds of bullets in the box. The box contained twenty-seven hollow-point bullets and fifteen round-nosed lead bullets. Among the hollow-point bullets in the box were four distinct elemental groups. From these four groups, one group matched one bullet fragment found in Darla Taylor's body and another group matched the other bullet found in her body. The expert witness testified that "it would be very unlikely that you could ... find another box of ammunition that had those two [different elemental] compositions in it." The expert explained that whenever his laboratory conducts a lead analysis the results are listed in the FBI computer. He testified that the computer contained between 7,500 and 8,000 listings. The bullets taken from Darla Taylor's body matched none of the other listings contained in the FBI's computer. Upon cross-examination, the expert concluded: "My analysis shows that [the bullet fragments taken from Darla Taylor's body] could have come from this box of ammunition and they most likely did."

The standard of review for sufficiency of the evidence is the same for both direct and circumstantial evidence. That standard is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Brandley v. State*, 691 S.W.2d 699, 703 (Tex.Crim.App.1985). Therefore, we must examine all the evidence to determine whether the evidence would be sufficient to support a verdict of guilty. *Id.* We apply this standard by determining whether the evidence supports an inference other than the guilt of the accused. *Id.*

"It is well established that a conviction on circumstantial evidence cannot be sus-

tained if the circumstances do not exclude every other reasonable hypothesis except that of the [accused's] guilt and proof amounting only to a strong suspicion is insufficient." *Flores v. State*, 551 S.W.2d 364, 367 (Tex.Crim.App.1977). "In circumstantial evidence cases it is not necessary, however, that every fact point directly and independently to the defendant's guilt. It is enough if the conclusion is warranted by the combined and cumulative force of all the circumstances." *Flores*, 551 S.W.2d at 367.

█ Therefore, we look for the essential elements that connect appellant with the murder. Motive, opportunity and means are apparent. The facts presented by the prosecution, which is the only evidence in the case, leads to the hypothesis that excludes the possibility that someone other than appellant committed the murder.

This analysis does not require us to ask whether *we* believe the evidence at trial established guilt beyond a reasonable doubt, but only whether any rational trier of fact could have believed guilt was so established. *Carlsen v. State*, 654 S.W.2d 444, 448 (Tex.Crim.App.1983).

[I]n a circumstantial evidence case the State is not required to prove to a moral certainty that the circumstances present actually exclude *every* hypothesis that the criminal act *may* have been committed by another person; it must only exclude every *reasonable* hypothesis *raised by the evidence* that would tend to exculpate the accused ... it is enough that the conclusion of guilt is warranted by the *combined* and *cumulative* force of all the incriminating circumstances. If the evidence presents such a reasonable hypothesis and the State does not disprove it, then the accused has not been proven guilty beyond a reasonable doubt.

*Brandley*, 691 S.W.2d at 703–04. (Emphasis in original and emphasis added.)

Appellant cites two circumstantial evidence cases, *Nathan v. State*, 611 S.W.2d 69 (Tex.Crim.App.1981), and *Flores v. State*, 551 S.W.2d 364 (Tex.Crim.App.1977),

as authority that the evidence in his case is insufficient to support a verdict of guilt. While *Nathan* and *Flores* both have some similarity to this case, each is distinguishable.

The evidence in *Flores* revealed that Flores was driving the victim's Chrysler in Frio County approximately 24 hours after the victim was last seen alive in Mills County, many miles away. He was still in possession of the car when he was arrested a month later. The license plates and inspection stickers had been changed. Flores also had stored the victim's suitcase. Bloodstains were found on the front seat of the car and on one of Flores's shirts, but the stains did not respond to typing procedures. The murder weapon was never discovered.

The *Flores* court noted that the strongest evidence against Flores was his possession of the victim's car 24 hours after the victim was last seen alive, and his possession of the car and the victim's suitcase over a month after the victim disappeared. The court stated that all of this evidence created only a strong suspicion of Flores' guilt. In *Flores*, however, the appellant was not seen in the victim's car until 24 hours after the victim was last seen alive; furthermore, there was no proof of the time that the victim died. In the instant case, appellant was seen driving Darla Taylor's car *within one hour* after she was last seen alive. Her time of death was also established as occurring that very evening. In addition, the bullets in Darla Taylor's body matched bullets found in appellant's apartment. Two witnesses testified that appellant and Darla Taylor were both seen at the Safeway store shortly before her disappearance. We, therefore, distinguish *Flores* from the instant case.

Appellant also cites *Nathan v. State*, 611 S.W.2d 69 (Tex.Crim.App.1981), as requiring reversal here. In *Nathan*, the skeleton of the victim was discovered on a beach several years after his disappearance. A number of weeds had grown through the victim's shirt, causing some holes, but there was evidence indicating that some of

the holes could have been caused by bullets. There was also some evidence that the shirt contained blood stains.

The *Nathan* court held, based on *Flores*, that, while the circumstances lead to a strong suspicion or probability that Nathan committed the murder, it did not "exclude to a moral certainty every reasonable hypothesis except [Nathan's] guilt...." 611 S.W.2d at 78. Appellant argues that *Nathan* requires reversal in this case. We distinguish *Nathan* for the same reasons outlined above under our discussion of *Flores*.

More nearly on point here is *Brandley v. State*, 691 S.W.2d 699 (Tex.Crim.App.1985) in which the conviction was affirmed. In *Brandley*, the defendant, a high school janitor, was alone in an auditorium with the victim, a student, at the time of her rape and murder. The girl, at school on a Saturday for a volleyball match, had come to the auditorium to use the rest room. Brandley was on his way to replace the toilet paper in the girls' rest room when he was told by other janitors that it was occupied. He then instructed the other janitors to go work in another building, and told them he would follow them later. A few hours later, when people began to search for the girl, it was Brandley who suggested three times that they look in the loft above the stage where the body was found. Brandley's belt matched the strangulation marks around the girl's neck. The medical examiner testified that the victim's bladder was empty, indicating that she had died within fifteen minutes from the time she used the rest room. The victim's clothes were found in a trash bag identical to the ones used by janitors, and a mop string was found on her jeans. The janitor's closet, with mops and trash bags, was next to the girl's rest room in the auditorium. Earlier that summer, upon seeing some high school girls, Brandley had remarked to a fellow janitor, "if he got one of them alone, ain't no telling what he might do." 691 S.W.2d at 702. In affirming the conviction, the *Brandley* court stated, "No reasonable hypothesis is presented by the evidence even to *suggest* that someone other than appel-

lant committed the offense." 691 S.W.2d at 704. (Emphasis in original.)

Appellant attempts to distinguish *Brandley* from his case. While the *Brandley* evidence is somewhat different than that in the instant case, Brandley was connected to the victim as appellant was in this case. Considering all the evidence in the light most favorable to the prosecution, we hold that a rational trier of fact could have found appellant guilty beyond a reasonable doubt. The evidence excludes every *reasonable* hypothesis other than appellant's guilt. Appellant's first point of error is overruled.

## INSTRUCTING THE JURY ON THE PAROLE LAW

In his second and third points of error, appellant contends that the District Court committed fundamental error by submitting the jury instructions regarding the parole law and good time under TEX. CODE CRIM.PROC.ANN. art. 37.07 § 4(a) (Vernon Supp.1986) because that section allows unconstitutional violations of the separation of powers between the judicial and executive, and the legislative and judicial branches of government.

After outlining a correct synopsis of the parole laws, the trial court, without objection, instructed the jury as follows:

Eligibility for parole does not guarantee that parole will be granted. It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities. You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

Appellant argues that "[t]he statute and its prescribed instructions impermissibly require the judicial branch through the jury to anticipate the exercise of the executive power to parole in reaching a verdict as to punishment." Appellant claims that the judicial instructions and the mandate from the legislature to give those instructions were unconstitutional and that they caused him egregious harm by inflating his sentence. We disagree. Although appellant has failed to show he was harmed in any way by the instruction, because of the question of fundamental error involved, we must address his claims.

 The essence of a separation of powers violation is that one branch of government exercises powers not constitutionally delegated to it and not within its division of governmental functions. *See* TEX. CONST. art. II, § 1, interp. commentary, (Vernon 1984). We believe the legislature was not outside its powers when it passed § 4 of article 37.07 of the Code of Criminal Procedure.

The legislature had the authority to pass the statute. The first portion of art. IV, § 11 of the Texas Constitution provides that the legislature shall by law establish a Board of Pardons and Paroles and shall require it to keep a record of its actions and the reasons for its actions. This section also states that *the legislature shall have authority to enact parole laws.*

Elsewhere, the legislature has provided that the Board of Pardons and Paroles is the agency of state government with exclusive power to determine paroles. TEX. CODE CRIM.PROC.ANN. art. 42.18 § 1 (Vernon Supp.1986). This section should be read as saying "the Board of Pardons and Paroles (as opposed to some other state agency) shall be the sole agency authorized to determine paroles" rather than "the Board of Pardons and Paroles is the sole body authorized to determine when someone will be admitted to parole under any and all circumstances." *See* art. 42.18, § 8(a) (Vernon Supp.1986). The Board may release on parole any person confined in a penal institution who is eligible for parole.

Eligibility rules are specifically set out in § 8(b) of art. 42.18. All paroles issue upon order of the Board. *Id.*, § 8(a).

The constitutional implications are clear: the constitution has commanded that the legislature establish a Board of Pardons and Paroles but it has given the legislature sole authority to enact parole laws. Therefore, the only discretion given to the Board of Pardons and Paroles is that delegated to it by the legislature, and such discretion is always subject to the continuing control of the legislature. Thus, appellant's contention that parole is exclusively an executive function is an oversimplification. A more correct statement of the Board's discretion would be that the Board of Pardons and Paroles has the discretion delegated to it by the legislature within the focus of legislatively mandated eligibility limits to release imprisoned persons on parole.

It is important to take full account of the great degree of control the legislature has over the parole process. The legislature controls the eligibility limits for parole and can raise or lower them at its discretion. For example, pursuant to TEX.CODE CRIM.PROC.ANN. art. 42.18 § 8(b) (Vernon Supp.1986), those prisoners who have committed more serious offenses or have used a deadly weapon have much higher parole eligibility limits. Given this degree of control over the parole process, it is not a necessary conclusion that the legislature lacks the constitutional authority to direct that admonitory instructions be given respecting this process over which it has constitutionally-established control. When one considers the care and detail with which the legislature controls this process, it becomes clear that if the legislature felt that too many persons were being released on parole, it could remedy the situation in a more direct manner, such as lengthening eligibility periods. Thus, the legislature need not have resorted to subterfuge to achieve that result.

If there is indeed any interference with executive discretion occasioned by article 37.07 § 4, it can only be within the narrow scope of discretion beyond the eligibility

limits established by the legislature. Consequently, we must examine whether the parole instructions authorize any jury interference in this area.

The first portion of the instruction mandated by article 37.07 § 4(a) (the subsection applicable in this case) informs the jury of the existence of parole and good conduct time. The jury is informed that either parole or good conduct time could reduce the length of time that the defendant might be in prison. From this information, the instruction details the parole eligibility limits applicable to the case. Next, the instruction admonishes the jury that it cannot accurately be predicted how parole and good conduct time might be applied to the defendant because application of these laws depends on decisions made by prison and parole authorities. Finally, the instructions tell the jury that it may consider the existence of parole and good conduct time but not how these factors might be applied to the defendant.

▋ No constitutional violation inheres in article 37.07 § 4. The mere *mention* of parole would not create a separation of powers violation; simply mentioning parole in jury discussions does not constitute reversible error because the existence of parole is common knowledge among jurors. *Jones v. State*, 596 S.W.2d 134, 137 (Tex. Crim.App.1980); *Jones v. State*, 522 S.W.2d 225, 226 (Tex.Crim.App.1975). Similarly, the mention of parole eligibility dates does not create a constitutional violation absent some indication in the charge that these dates would be applied to the defendant. The statutory instruction then specifically directs jurors *not* to consider the application of parole law; this is so because the decision to release the defendant on parole will be subject to decisions of other authorities and it cannot be predicted accurately when the defendant will be released on parole.

Appellant argues that, by giving the jury information about eligibility limits, the statute:

> encourages jurors to take into account the executive grant of parole in assess-

ing a sentence. This naturally leads to an inflation of the sentence in an attempt to account for the defendant's early release. By increasing the sentence, the jury is able to effectively deprive the Board of Pardons and Paroles and the Governor of their discretion to parole a defendant at the appropriate time.

We disagree. The legislative history to article 37.07 § 4 clearly indicates that the legislature meant the instructions under the statute to be admonition for jurors *not* to discuss parole in their deliberations. Parole eligibility limits were included to give jurors the assurance that parole was subject to precise standards. The bill analysis to this statute reads as follows:

### Background Information

There has been an outcry from public citizens serving as jurors that the sentences that have been handed down have differentiated greatly from the sentences actually served. Jurors have indicated in some instances that they were recommending even longer sentences in order to compensate for the time which would be knocked off the sentence by the combination of good time credit and eligibility for parole.

### Problem(s) that the bill addresses:

Public citizens serving as jurors from across the State have indicated that they need to be informed that the defendant may, but will not necessarily, be incarcerated for the full length of the sentence imposed; and the guidelines that are used to reduce the sentences through parole and good time credit.

HOUSE COM. ON JURISPRUDENCE, BILL ANALYSIS, Tex. S.B. 37, 69th Leg. (1985). The legislature apparently believes that if common knowledge of parole and good conduct time is made explicit, along with an admonition not to consider the application of these factors, the incidence of jury misconduct will be reduced. The parole eligibility limits are included not to encourage parole calculations, but to assure jurors that eligibility *for* parole is

subject to a legislatively mandated formula. Indeed, the effect of this instruction may well be to reassure some jurors that imprisoned persons may not be eligible for parole as quickly as they might think. This portion of the instructions is to clear up misconceptions of the parole law.

Obviously, the legislature has weighed opposing considerations in deciding to inform jurors as to parole eligibility limits, but the legislature has evidently determined that the possible risk in jurors considering parole in their deliberations in the face of the admonition is counterbalanced by the beneficial effect of informing the jurors that parole is not an arbitrary decision. From the bill analysis we know that the legislature recognizes that jurors have been discussing parole anyway; the legislature thus has determined that a new approach is needed towards this problem.

In the final analysis, we must read the statute as written. Article 37.07 § 4 nowhere permits or encourages juries to apply parole laws in determining punishment. There is no legislative history or other evidence that would justify the conclusion that the legislature did not mean exactly what it said by this statute; indeed the available legislative history mandates a contrary conclusion. This statute must be construed according to the plain meaning of its text.

"The courts of this state will hold an act unconstitutional only if a specific provision inhibits the legislation, or such is clearly implied." *Texas Public Building Authority v. Mattox*, 686 S.W.2d 924, 927 (Tex. 1985). "The legislative branch of the government has full authority to pass laws except in the particulars wherein it is restricted by the Constitution of the United States or forbidden by the express or implied provisions of the Constitution of the State. And courts will not declare an act unconstitutional unless it is clearly made to appear in its enactment that the Legislature has exceeded its powers. . . ." *Lyle v. State*, 80 Tex.Cr.R. 606, 193 S.W. 680 (1917).

Nothing in the Texas Constitution, either express or implied, prohibits the legislature from enacting a law requiring a judge to give the jury a particular instruction on parole and good time. In fact, the Texas Code of Criminal Procedure includes other sections which provide for mandatory jury instructions, *e.g.*, TEX.CODE CRIM.PROC. ANN. art. 38.07 (Vernon Supp.1986) (weight to be given evidence in sexual assault cases); TEX.CODE CRIM.PROC. ANN. art. 38.17 (Vernon 1979) (instruction for uncorroborated testimony).

As commentators have noted:

[D]espite the fact that the principle of separation of powers is accepted as binding and prohibits blending of the powers of the three departments, still the practical necessities of efficient government have prevented its complete application. The Texas Constitution itself vests in each of the three departments certain powers which, in their essential nature, have not belonged to it. Article II recognizes this when it states that "no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in instances herein expressly permitted."

Thus, the Constitution expressly permits the Supreme Court to exercise the essentially legislative power of making certain rules of procedure, and the executive power to appoint a clerk. The executive has been granted the legislative veto, and the judicial right of pardoning. The legislature has been given the judicial powers of impeachment and the right to judge of the qualifications and elections of its own members; and the Senate, the essentially executive power of participating in the appointment of officials.

Thus, it is not exactly correct to state the principle of separation of powers as absolutely prohibiting performance by one department of acts which by their essential nature belong to another. Rather, the correct statement is that a department may constitutionally exercise any power whatever its essential nature, which has, by the constitution, been del-

egated to it; but that it may not exercise powers not so constitutionally granted which from their essential nature do not fall within its division of governmental functions.

TEX. CONST. art. 2, § 1, interp. commentary (Vernon 1984).

While the legislature may have gone close to the "separation of powers" line in enacting article 37.07 § 4, we hold that they did not cross it. Our own criminal law and criminal procedure is codified and regulated by the Penal Code and the Code of Criminal Procedure which the legislature had the authority to enact. While a judge has wide discretion in the conduct of a trial, the legislature has a right to determine the procedure to be followed as long as that procedure does not interfere with the trial court's fundamental discretionary powers. Merely informing a jury what the law is and admonishing them not to use the information in deciding the sentence does not interfere with the discretion of the court. All the legislature is doing is attempting to establish some uniformity in the presentation of parole law information to juries.

Appellant cites *Williams v. State,* 461 P.2d 997 (Okla.Crim.App.1969) and *Farris v. State,* 535 S.W.2d 608 (Tenn.1976), as authority for holding that article 37.07 § 4 violates the separation of powers between the legislative and judicial branches. Appellant urges reversal based on these cases. While both *Williams* and *Farris* do hold that statutes similar to article 37.07 § 4 are unconstitutional, in neither case was the appellant's conviction reversed. In both cases the courts merely reduced the appellants' sentences. 535 S.W.2d at 614; 461 P.2d at 1001. The *Farris* court expressly refused to apply its holding retroactively. 535 S.W.2d at 614. Even if we agreed with the holdings in *Williams* and *Farris,* neither case would require reversal. Appellant's second and third points of error are overruled.

In his fourth point of error, appellant contends that the trial court committed fundamental error when it submitted the jury instructions on parole law and good time under article 37.07 § 4. Appellant claims that article 37.07 § 4 and the instructions based upon it are "unconstitutionally vague, contradictory and incomprehensible," and a violation of due process. We disagree.

According to appellant, the defect which renders the instructions unconstitutional is that the concluding admonitory paragraphs create an irreconcilable conflict. The appellant claims he cannot understand how jurors are expected to distinguish between considering the existence of the parole law and the manner of its application.

In fact, no conflicts appear upon a close reading of the admonitory portion of the instruction:

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

This instruction is completely understandable. The jury is first informed that it may consider the existence of parole and good conduct time; in other words, the jury may take note of what is common knowledge in any event, that prisoners are from time to time released on parole before serving their entire sentence. Nevertheless, the jury may not consider the application of parole and good conduct time laws to the defendant; in other words, the jurors may not attempt to predict when the defendant might be released on parole because, as explained earlier, the defendant's release date will be subject to decisions made by prison and parole authorities. It creates no irreconcilable conflict to state that the jury need not speculate on the application of parole in assessing punishment. Appellant's fourth point of error is overruled.

In his fifth point of error, appellant claims the trial court's use of the jury instructions required under article 37.07

§ 4(a) was fundamental error because the statute is an unconstitutional *ex post facto* law as applied to appellant.

Appellant committed this offense on March 31, 1985. TEX.CODE CRIM.PROC. ANN. art. 37.07 § 4(a) became effective September 1, 1985. Article I, § 10 of the United States Constitution and TEX. CONST. article I, § 16, both bar *ex post facto* laws.

The Court of Criminal Appeals has recently addressed the question of *ex post facto* laws. In *Ex Parte Bonham*, 707 S.W.2d 107 (Tex.Crim.App.1986), the court defined what are *ex post facto* laws. The court quoted an early United States Supreme Court case, *Calder v. Bull*, 3 Dall. 386, 3 U.S. 386, 1 L.Ed. 648 (1798). Writing for the Court in *Calder*, Justice Chase stated:

> I will state what laws I consider *ex post facto* laws, within the words and the intent of the prohibition. 1st. Every law that makes an action done before the passing of the law; and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender. All these, and similar laws, are manifestly unjust and oppressive....

3 Dall. at 390, 3 U.S. at 390, 1 L.Ed. at 650, *quoted in Bonham*, 707 S.W.2d at 109.

The Court of Criminal Appeals also noted it had defined an *ex post facto* law as follows: " ... [a] law which changes the punishment for a crime after the crime has been committed is an ex post factor law as prohibited by Tex. Const., Art. I, Sec. 16, Vernon's Ann.St. and U.S. Const., Art. I, Sec. 10, (sic) ... *Ex parte Tate*, 471 S.W.2d 404 (Tex.Crim.App.1971)", *quoted in Ex parte Bonham*, 707 S.W.2d at 109.

Article 37.07 § 4(a) does not change or enhance the punishment for murder. It does not aggravate the offense or create a new one. Nor does it alter the rules of evidence in order to convict the defendant. Therefore, we hold that article 37.07 § 4(a) is not an unconstitutional *ex post facto* law. Appellant's fifth point of error is overruled.

In his sixth point of error, appellant claims the trial court committed fundamental error when it submitted the jury instructions on parole under article 37.07 § 4(a). Appellant contends that these instructions were not authorized by the statute. We disagree.

The parole instructions given to the jury were based on article 37.07 § 4(a). Appellant claims those instructions are only authorized by the statute:

> if the offense of which the jury has found the defendant guilty is listed in *Section 3f(a)(1), Article 42.12, of this code* or if the judgment contains an affirmative finding under *Section 3f(a)(2), Article 42.12, of this code* ...

TEX.CODE CRIM.PROC.ANN. art. 37.07 § 4(a) (Vernon Supp.1986) (Emphasis added.) Appellant argues that "[s]ince there are no sections such as "Section 3f(a)(1), Article 42.12" or "Section 3f(a)(2), Article 42.12", [appellant's] case could not have come within Article 37.07, § 4(a)...."

This inconsistency in the statute was apparently due to legislative oversight. During the 69th Legislative Session, articles 37.07 and 42.12 were amended by adding section 4 to article 37.07 and by adding a new section 3f to article 42.12. Old section 3f then became 3g. *See* Act of May 2, 1985, Ch. 427, §§ 3f and 3g, 1985 Tex. Sess. Law Serv. 4446–4449 (Vernon). In doing so the legislature apparently neglected to change the cross-reference in article 37.07 § 4 to reflect the recodification of article 42.12. However, it is more than apparent that article 37.07's references to 3f is to the old 3f which is now 3g. The Texas Government Code requires that we construe the statute reasonably. TEX.GOV'T CODE

736

ANN. §§ 311.021 and 311.023 (Vernon Pamphlet 1986).

TEX. GOV'T CODE ANN. §§ 311.021 and 311.023 were formerly part of the Code Construction Act, TEX. REV. CIV. STAT. ANN. art. 5429b–2 (Vernon Supp.1986) *repealed by* Acts 1985, 69th leg., p. 3361, ch. 479, § 224, eff. Sept. 1, 1985. The Code Construction Act was reenacted in substantially the same form in the Texas Government Code. The Code Construction Act is applicable to each amendment, repeal, revision and reenactment of any provisions of the Code of Criminal Procedure enacted by the 60th or any subsequent legislature. *Barbee v. State,* 432 S.W.2d 78, 82 (Tex. Crim.App.1968). A construction which would create a needless conflict between separate articles of the Code of Criminal Procedure is to be avoided if at all possible. *Summerford v. State,* 627 S.W.2d 468, 471 (Tex.App.—Houston [1st Dist.] 1981, no writ). To hold that article 37.07 § 4 does not authorize the jury instructions in this case would be an unreasonable construction of the statute and would create a needless conflict between article 37.07 § 4 and article 42.12 of the Code of Criminal Procedure. We presume the legislature intended a reasonable construction. Appellant's sixth point of error is overruled.

Accordingly, the judgment of the trial court is affirmed.