Calvin Lee JOHNSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 09 86 050 CR.

Court of Appeals of Texas, Beaumont.

Sept. 16, 1987.

Donald M. Brown, Morris, Brown & Davis, Conroe, for appellant.

William H. Behler, Jr., First Asst. Dist. Atty., Conroe, for appellee.

## OPINION

BROOKSHIRE, Justice.

The grand jury of Montgomery County indicted Calvin Lee Johnson on the charge of attempted capital murder under the terms of section 19.03 of the Texas Penal

Code. The indictment, in capsule form, charged that the Appellant:

"[W]ith specific intent to commit the offense of capital murder of Barbara Brown, attempt to intentionally cause the death of Barbara Brown by shooting her with a firearm in the course of committing and attempting to commit robbery of Barbara Brown and Riley Tomlin;...."

The next paragraph charged that the Appellant:

"[W]ith specific intent to commit the offense of capital murder of Riley Tomlin, attempt to intentionally cause the death of Riley Tomlin by shooting him with a firearm in the course of committing and attempting to commit robbery of Barbara Brown and Riley Tomlin;...."

There were three enhancement paragraphs. In sequence, these paragraphs charged that the accused was convicted of aggravated robbery in the District Court of Harris County, Texas, in December, 1982; that he was convicted of robbery by assault in Harris County in October, 1973; and that, in a separate cause, in October, 1973, the Appellant was again convicted of robbery by assault. The offense in the instant case was alleged to have occurred on or about March 8, 1985. The case was submitted to the jury on November 21, 1985. On the same date, the jury returned a verdict finding the Appellant guilty of both counts of attempted capital murder as charged in the grand jury indictment. The next day, punishment was set at 99 years on each count. The jury made findings of "true" for each of the enhancement paragraphs. There was an affirmative finding made by the jury that Appellant used a firearm in each offense. The district judge ordered that the two sentences were to run consecutively.

Barbara Brown testified that she had been a resident of Montgomery County for seven years and that in March of 1985 she was engaged in the nursery business, describing herself as a person who "watches plants, grows them and things." At the time of the offense, she had been in this business for a year to the day. The nursery was known as the Lost Pines Nursery. She testified that Riley Tomlin came in on the morning of March 8, 1985, at about 10:15, to purchase some tomato plants and that they discussed the various types of plants. At about 10:30 a.m., a yellow mustang automobile pulled into the yard and a black male got out. At that particular time, Mrs. Brown was talking on the telephone. When she hung up the phone and turned around, Mr. Tomlin was facing her with his back to the door of the nursery. As she turned around, Mrs. Brown saw the black man running toward her with a gun that she described as a revolver. The assailant ran about 25 feet, stopped 4 feet directly in front of Mrs. Brown and looked her straight in the face. At this point, Mr. Tomlin turned around, but the assailant told him: "Don't look at me, lay down." The assailant shoved Tomlin down; Brown laid down on her stomach. The black man then demanded to know where the money was and Brown replied that it was in a cash box sitting on the counter. The black man took the money out of the cash box and then took Tomlin's billfold out of his pocket.

The assailant continued to demand: "Where's the money?" Mrs. Brown replied that there was no more money since it was a small nursery. Only seconds later, according to Brown, the black male stepped over her and put his hand between her legs in a most inappropriate manner. She testified that this angered her and she moved her body away but, at that point, the assailant kicked her in the ribs and grabbed her neck. The assailant then began digging under her collar and demanded that she take off her wedding ring. She tried to remove the ring but she was unable. The black male then demanded to know where her purse was. She replied it was in the truck and the keys were in the truck. Mrs. Brown said that, from the sounds made by his footsteps, the assailant ran to the truck, which took about thirty seconds, and ran back. She did not get up or try to run

away because she was "scared of dying." By this point, she had seen the black man's face and had seen the gun. In fact, she looked at him several times as he forced her to lie down. She also looked at him as she was trying to get the ring off, testifying at trial: "I really looked square at him again." At trial, Brown swore she had the picture of his appearance and facial features in her mind very clearly and she made an in-court identification of Appellant as the assailant. According to Mrs. Brown, after Appellant returned from the truck, he walked to the far end of the greenhouse. She estimated that this was about a hundred-foot walk. It was when he returned from this walk that he shot Riley Tomlin. Brown thought Tomlin was dead and assumed she would be the next to die.

"Q What happened next?

"A Then he shot me.

"Q Where did he shoot—

"A My head was down on the cement this way, and from the angle that he was standing, which was basically in front of me, I got shot right here, and then he walked behind me, and shot here, behind my ear. So, there was a period of time between this shot and this shot.

"Q You mean he walked around?

"A Walked, yeah, walked behind me.

"Q And, the first shot hit you in the left ear of your head?

"A Right up here.

"Q Did that cause pain?

"A Yeah, it really hurt, but it didn't knock me out, I never, ever, lost consciousness at any point, I tried to be dead at that point.

"Q You tried to play dead?

"A Right, but I guess I breathed too much or I moved again, or I don't know, and this—when I got shot here, it really kind of picked my body up and kind of slammed it down.

"Q Did you feel yourself move?

"A Yeah, I really did, and that one hurt a lot. And, after I got shot on this side, I really couldn't get up at that point, because it took my equilibrium away."

The record shows that, before shooting Brown, the Appellant shot Riley Tomlin twice in the head as he lay face down. She then heard Appellant speed away. The .22 caliber bullets used had not actually penetrated the skulls of the victims. They both remained conscious. Tomlin was able to arise and call the Sheriff's Department. Tomlin also made an in-court identification of the Appellant. Tomlin said he got a "good look" at the person and, further, that he still held an image of his assailant. Tomlin made a positive in-court identification of the Appellant, describing him as a black male with a green suit, maroon shirt, and white socks, sitting there at the defense table. Tomlin said his assailant was seated two persons to the left of the district attorney. The court agreed and the record reflected that the witness had identified the Appellant. Tomlin swore that the accused—our Appellant—forcibly and without his consent, took Tomlin's wallet from his left rear pocket. It contained various credit cards, a social security card, a driver's license and approximately forty dollars in United States currency. Riley Tomlin's testimony was harmonious and consistent with the version of the facts given by Barbara Brown. Tomlin swore that, after the Appellant made his walk through the nursery building, he came back and shot Tomlin in the back of his head. However, Tomlin did not pass out.

"Q You stayed conscious?

"A Yes, I felt like I could feel my body quivering like a dog or cat that had been knocked in the head, and I said, 'Oh, God,' and he shot me again in the back of the head.

"Q Did you pass out that time?

"A No, I didn't, I stayed conscious.

"Q Was there pain?

"A Pardon?

"Q Was there pain?

"A Excruciating pain."

The first deputies to arrive at the scene of the robbery had the description of the assailant broadcast over the radio. Deputy

Sheriff Bobby Coker set up a surveillance on IH 45 in south Montgomery County. After taking up his position, he saw and began to pursue a yellow mustang driven by a black male in a generally southerly direction. Coker pulled alongside the yellow mustang and obtained a good look at the driver. The driver first looked at the officer, pointed his pistol at him only briefly, then threw the pistol out his right car window over the bridge railing and into a creek bed. Deputy Coker identified the Appellant as the driver of the yellow mustang and the person who threw the pistol into the creek bed. Coker could see that the driver of the mustang had a revolver, as distinguished from an automatic pistol, and saw the driver actually point this revolver at him. The handgun hit the rail of the Spring Creek bridge and fell to the bottom of the creek. Deputy Coker temporarily lost sight of the yellow mustang and, later, found it abandoned. The Appellant was later arrested in Harris County.

Although the driver of the yellow mustang temporarily eluded Deputy Coker, he did stay in hot pursuit. The deputy regained sight of the vehicle shortly before Appellant abandoned it. Deputy Coker searched for Appellant in the woods at the roadside but was not successful. Nevertheless, the yellow mustang was carefully inspected, photographed, and dusted for fingerprints. It was ultimately traced to relatives of the Appellant who told officers the Appellant's name. The pistol was recovered from the creek bed.

The Appellant presents sixteen points of review. Appellant groups the first three alleged errors, arguing that the State's attorney should not have been allowed to examine the jury panel at voir dire as to the full range of punishment available upon a showing of prior convictions. The Appellant also alleges that the jury panel was tainted by the State's voir dire examination concerning the prior convictions and, hence, reversible error was committed when the trial court denied the Appellant's motion for mistrial.

■ The major thrust of Appellant's first three grounds is that the State should not have a right to voir dire the jury on the full range of punishment potentially applicable in the case. He objected to voir dire examination consisting of an abstract discussion of the enhancement paragraphs and their effect on the total range of punishment. We think the law has been decided adversely to Appellant. This type of voir dire puts both sides in a position to intelligently exercise their peremptory challenges. Appellant argues, by inference, that he suffered from inflammatory or prejudicial voir dire. We disagree. *Myers v. State*, 527 S.W.2d 307 (Tex.Crim.App. 1975). We hold that points of error one, two and three are overruled.

■ Next, the Appellant contends that error was committed when the trial court permitted Officer Sauls to testify that Theresa Johnson had told him that the Appellant was her brother. A long established exception to the hearsay rule is statements concerning family history and blood relatives. Such statements are even admissible in cases to determine the ownership of land. In their various treatises on the law of evidence, Dean Charles Tilford McCormick, the master builder of Texas law of evidence, in collaboration with Professor Roy R. Ray, have long recognized that declarations and statements concerning pedigree and family history are exceptions to the hearsay rule. These eminent legal writers have described this exception as one of the oldest exceptions to the hearsay rule. The degree of trustworthiness lies in the strong "probability that the natural effusions of those who talk over family affairs ... are fairly trustworthy." This sort of declaration is given weight in the ordinary affairs of life and should be given weight by judges and juries. 1A R. Ray, *TEXAS LAW OF EVIDENCE secs. 1341–1350* (Texas Practice 3d ed. 1980). *TEX.R. CRIM.EVID. 803(19)* provides that statements and declarations concerning personal or family history are not to be excluded by the hearsay rule even though the declarant

is available as a witness. Point of error number four is overruled.

In point of error number five, Appellant claims that the trial court committed error in admitting testimony relating to Officer Sauls' efforts to determine who had been driving the yellow mustang. Appellant boldly asserts that Theresa Johnson's statement to Sauls that her brother had been driving the yellow mustang was hearsay and constituted reversible error.

■ Appellant argues that the officer was allowed to testify that Theresa Johnson told him who was driving the yellow mustang. We do not so read the record. We do not find testimony from the officer, given in court and offered for the truth thereof, identified as the statements made out of court by Theresa Johnson stating who was actually driving the yellow mustang. But if we are wrong in this, we hold, after reviewing the record, the admission of such evidence did not harm this Appellant beyond a reasonable doubt. One reasonable reading and interpretation of Officer Sauls' testimony on this point was that he did attempt to obtain information from Theresa Johnson relating to who was driving the yellow mustang which he, in turn, related to his superiors. But Sauls' testimony before the jury did not set out in detail what information he obtained, and he did not affirmatively state that it was Theresa Johnson who told him that the Appellant was driving the yellow mustang. Point of error number five is overruled.

■ In point of error number six, complaint is made that the State bolstered the testimony of Barbara Brown, one of the victims of the offense. The testimony was that of Julia Ann Hales, a registered nurse at the Medical Center Hospital, who served as a nursing supervisor there. Nurse Hales testified that no one influenced Barbara Brown in the photo spread identification, that she had no difficulties whatsoever in making the identification from the photo spread, that she was physically and mentally capable of talking with the detective who

came with the photo spread, and, further, that Mrs. Brown was alert and conscious and agreed to look at the photos. Of course, Julia Hales did not testify as to whether this defendant was, in any way, connected with the offense charged. In *Sledge v. State*, 686 S.W.2d 127 (Tex.Crim. App.1984), the court writes:

"The general rule is that third party testimony of an extrajudicial identification by a complainant is not admissible to support that complainant's own identification testimony. *Lyons v. State*, supra. Such evidence would constitute corroboration where none is required, and would simply 'bolster' the complainant's identification of a defendant. 'Bolstering' occurs when one item of evidence is improperly used by a party to add credence or weight to some earlier unimpeached piece of evidence offered by the same party. *Pless v. State*, 576 S.W.2d 83 (Tex.Cr.App.1979)."

As we read the record, Julia Hales did not make an extra-judicial identification of the Appellant. She testified as to the circumstances surrounding the identification Barbara Brown made while she was in the hospital and Brown's physical and mental condition at the time Barbara made the identification from a photo spread. *Sledge* holds that such evidence would constitute corroboration when none is required and would simply bolster the identification of a defendant. Since the State has the burden of proving the elements of a crime beyond a reasonable doubt, we cannot see how such corroboration would constitute reversible error. In his able brief, Appellant claims that identification is the only real issue in the case and that counsel for Appellant attempted to impeach the identification by pointing out that the Appellant was the only black man sitting at the two counsels' tables, that such in-court identification was, therefore, suspect since all of the other persons sitting at the counsels' tables were white, and Barbara Brown, knowing that her assailant was black, could not have made the most valid type of identification. Of course, once the identification testimony

of the complainant is impeached, any third-party corroboration becomes admissible as a method of rehabilitating the witness. In these circumstances, it is simply not "bolstering." *See Sledge.* Moreover, it is well established that third-party testimony, such as Nurse Hales', as to the extra-judicial identification, will be admitted if it serves, in any manner, to rehabilitate a complainant's identification testimony which has been subjected to any type of attempted impeachment. *See Beasley v. State,* 428 S.W.2d 317 (Tex.Crim.App.1968). Point of error number six is overruled.

■ In points of error numbers seven and eight, the Appellant asserts that reversible error was committed when the State's counsel, in his final jury argument, argued that he did not think the victims would have testified that Appellant had shot them if they were not sure in their minds of the identity of their assailant. We decide that counsel for the State was summing up the evidence to show that the elements of the offenses had been adequately proved. He argued that he did not think anybody in good faith could assert that attempted capital murder had not been committed and, further, that the two victims, Brown and Tomlin, did not equivocate in their in-court identification of the Appellant as the man who shot them both on March 8, 1985, in Montgomery County. He argued that the two victims, under the facts of the case, were the best judges of who shot them. The State's counsel was summarizing the evidence and making logical and reasonable, permissible deductions from the evidence. We overrule these points of error.

■ The ninth point of error complains that counsel for the State simply stated that there was a lack of evidence of any impermissibly suggestive photos or evidence concerning the identification of the Appellant. The argument was: "I don't think there's anything you're going to find that's impermissibly suggestive." This was, partially, a summary of the evidence and, partially, the opinion of the arguing counsel. Nevertheless, these opinions were based on the evidence in the record. For the jury argument to be reversible error, that argument must be extreme or manifestly improper, violative of a mandatory statute, or inject new facts harmful to the accused which were not based on the evidence in this case. We find that this did not occur in the State's argument. *McKay v. State,* 707 S.W.2d 23 (Tex.Crim.App. 1985), *cert. denied* 479 U.S. ——, 107 S.Ct. 239, 73 L.Ed.2d 164 (1986); *Alejandro v. State,* 493 S.W.2d 230 (Tex.Crim.App.1973); *Ramos v. State,* 419 S.W.2d 359 (Tex.Crim. App.1967). Points of error numbers seven through nine are overruled.

■ In points of error ten through twelve, the Appellant objects to the State's punishment phase exhibit number two, a penitentiary packet, and argues that, in the punishment phase, one of the State's exhibits referred to conviction on two counts under one cause number when the allegation in the actual indictment was only of one conviction. He also claims that other parts of the State's punishment phase, exhibit two, were improper and a variance between the proof and the allegations in the indictment occurred.

Appellant's objection in point eleven is that the judgment shows he was charged with two counts of aggravated robbery. Nevertheless, the same judgment shows that, on May 30, 1979, he entered a plea of guilty to one count and that the other count was abandoned. It also shows that punishment was set at nine years in the Texas Department of Corrections, to begin June 20, 1979.

In points of error ten and twelve, Appellant objects to pages one and five, respectively, of the same pen packet exhibit because of a reference made to two convictions which were reversed by the Court of Appeals. The trial court offered to delete the parts to which there was an objection, but able counsel for the Appellant was unwilling to have these matters deleted, stating the exhibit would not reflect the truth. In any event, the jury could clearly

see that one of the counts had been abandoned and that he pleaded guilty to another count. The court charged the jury, at the punishment stage, that the indictment alleged the defendant, Calvin Lee Johnson, had been convicted on or about the 14th day of December, 1982, in cause number 298,522 in the 263rd District Court in Harris County, of aggravated robbery, a felony, that the conviction had become final prior to commission of the offense in the instant case, and that to this allegation defendant had pleaded "not true." The court made it clear that there was only one final conviction, that being one for aggravated robbery, a felony, in number 298,522. Further, the court clearly charged that if the jury found enhancement paragraph three and either or both of the other enhancement paragraphs to be true, then it was to assess punishment at confinement in the penitentiary for life or for a term of years not more than 99 years nor less than 25 years. The jury found the allegations in enhancement counts three, four, and five to be true. Then, it assessed his punishment at confinement in the Texas Department of Corrections for 99 years. It should be noted that Appellant's specific objection in point of error ten is to page one of the penitentiary packet which refers to "Cause # 298,522 (2 Counts)." This page was the certification or the exemplification of the document needed to make it admissible. The actual judgment and sentence were on page three of the same exhibit. The court offered to remove that portion complained of. The court stated:

"... that he [State's attorney] does not wish to offer that portion of the exhibit pursuant to Mr. Brown's objections as to that portion of the exhibit, the Court will exclude that portion of the exhibit...."

In addition, it was clearly shown by the judgment, in cause number 298,522, that Appellant pleaded guilty to one count and that the other was abandoned. Under this record and under the instructions and charge to the jury in the punishment stage and under the jury's findings, there is no reversible error.

In point of error number twelve, Appellant objects to page five of the penitentiary packet, State's exhibit number two, to a reference to "Crime Agg. Rob. (2) (2–15 to 25 years)." We quote from the objections made by Appellant's counsel at trial:

"I object to the Punishment Phase Exhibit number two in it's [sic] entirety for the reason that it contains those matters objected to and further that any excising or changing of the substance of the certificates which are necessary to prove up the penitentiary packet is to change the document itself, so it does not speak the truth and if they were changed to correct the penitentiary packet to meet my objections, then they would not speak the truth and then they would be the certificates of the clerk certifying thereto that the facts are not true."

After the court had agreed to excise or white out the objectionable portion of the penitentiary packet, State's exhibit number two, which was declined, then this objection became one which invited error, if any error existed. In *Hall v. State,* 619 S.W.2d 156 (Tex.Crim.App.1980), the court held that the more recent authorities stand for the proposition that in alleging a prior conviction to enhance punishment, a variance between an allegation in the indictment and the proof is a material and fatal variance only if it would mislead a defendant to his prejudice. In fact, in *Hall,* the court overruled *Boone v. State,* 450 S.W.2d 614 (Tex. Crim.App.1970), and *Melancon v. State,* 367 S.W.2d 690 (Tex.Crim.App.1963). Under this record, the Appellant was not surprised. In the case subjudice, the enhancement paragraph in the indictment sufficiently identified the prior conviction, and the judgment in the penitentiary packet constituted proof that supported the allegation of, the prior conviction. There was no true, material variance. The language referring to two counts, when the jury considered the pen packet as a whole, was not a material or fatal variance, and thus, not reversible error. Again, it was not such a variance that would mislead this Appellant.

In *Plessinger v. State,* 536 S.W.2d 380, 381 (Tex.Crim.App.1976), the court wrote:

"While the carelessness here involved is not to be condoned, we are unable to say that appellant has *shown surprise* or that he *was misled* to his prejudice." (Emphasis added)

In *Plessinger,* there was at least a reasonable chance that the defendant was misled. The enhancement paragraph alleged that he had been previously convicted in the State of Texas, whereas, the proof showed that the conviction had taken place in the State of Arizona. The Court of Criminal Appeals, however, held that variance to be not fatal. Indeed, the object of the doctrine of variance between an allegation in an indictment and the proof is to avoid surprise to the accused. There was no surprise here. *Worsham v. State,* 56 Tex.Crim. 253, 120 S.W. 439 (1909). For such a variance to be material, it must mislead the accused to his prejudice. This accused was not so misled. *Plessinger, supra.* Points of error ten through twelve are overruled.

 Appellant's points of error thirteen and fourteen are frontal assaults on the parole law instruction. The complaint is against *TEX.CODE CRIM.PROC.ANN. art. 37.07, sec. 4* (Vernon Supp.1987). The first phase of this attack is that the caption to the bill was defective. We overrule that. *Baggett v. State,* 722 S.W.2d 700 (Tex. Crim.App.1987). In addition, we have previously held the parole law instruction to be constitutional over due process objections. *See Boudreaux v. State,* 723 S.W.2d 230 (Tex.App.—Beaumont 1986, no pet.) (Burgess, J. dissenting). *See also Rose v. State,* 724 S.W.2d 832 (Tex.App.—Dallas 1987, pet. granted) (on motion for rehearing); *Joslin v. State,* 722 S.W.2d 725 (Tex. App.—Dallas 1986, pet. granted).

 Nor did the trial court err in its charge in the punishment phase based on discrepancies in *art. 37.07, sec. 4(a)* which refer to *TEX. CODE CRIM.PROC.ANN. art. 42.12, secs. 3f(a)(1)* and *3f(a)(2).* The

sections of the Texas Code of Criminal Procedure, concerning this subject matter, have been renumbered as *Sec. 3g(a)(1)* and *(2)* of *art. 42.12. Sec. 3g(a)(1)* deals with capital murder, aggravated kidnapping, aggravated sexual assault and aggravated robbery. *Sec. 3g(a)(2)* deals with a defendant shown to have used or exhibited a deadly weapon. Merely inaccurately renumbering these sections in the amendment to *art. 37.07* as *sec. 3f(a)(1)* and *sec. 3f(a)(2)* does not constitute reversible error. And, of course, the new *sec. 3f(a)* and *(b)* of *art. 42.12* were added by the legislature to establish what is known as "shock probation", continuing jurisdiction in the courts of this state over misdemeanor cases in which a sentence requiring confinement is imposed for a ninety-day period from the date of the actual beginning of the execution of the sentence. It is simply a type of shock probation for persons who were sentenced to jail for a misdemeanor. *Section 3f* follows *sec. 3e* which deals with shock probation for conviction of a felony allowing the trial court to retain jurisdiction 180 days from the date of the execution of the sentence. It is reasonable and plausible, perhaps, to assume that the legislature, under the press of heavy legislative business, failed to pay as close attention to the details as it could have, but its intent to require the jury instruction on parole law is clear. *See TEX.GOV'T CODE ANN. sec. 311.021* (Vernon Pamph.1987), (relating to legislative intent in the enactment of statutes); *TEX.GOV'T CODE ANN. sec. 311.023* (Vernon Pamph.1987). We overrule points of error thirteen and fourteen.

 Point of error fifteen asserts that the trial court committed reversible error in entering sentences on both convictions resulting from multiple counts alleging two offenses from one transaction. We disagree and overrule this matter for review. These offenses did not grow out of the same transaction. There were two different people shot and two different robberies, one of Barbara Brown and one of Riley Tomlin. Furthermore, if two sepa-

rate and distinct offenses are alleged in one indictment, upon proper and timely request by the defendant, the State must elect which count it will prosecute and the other, of course, may be severed for separate trial. However, this right will be waived if the election is not demanded by proper, timely motion. There is no protest in this case against being convicted for more than one felony under one indictment. *Drake v. State*, 686 S.W.2d 935 (Tex.Crim.App.1985). The record shows that Appellant failed to request the State to elect. He failed to request a severance of these offenses. The Appellant did not protest being convicted and sentenced on both counts in the indictment. This point of error is, therefore, clearly waived.

We are not willing to abandon our decision in *Fortune v. State*, 699 S.W.2d 706 (Tex.App.—Beaumont 1985, pet. granted) (Burgess, J., concurred in part, dissented in part). See our footnote in *Fortune, supra*, at 709. In *Fortune*, the petition for discretionary review has been granted, but no decision has been handed down.

Appellant's final point of error alleges the court committed error by overruling Appellant's motion for dismissal under the Texas Speedy Trial Act. The Court of Criminal Appeals, however, on July 1, 1987, declared the Texas Speedy Trial Act unconstitutional and we are bound by that decision. *Meshell v. State*, 739 S.W.2d 246 (Tex.Crim.App.1987). Having found no error, we affirm the judgment and sentence below.

AFFIRMED.

BURGESS, Justice, concurring and dissenting.

I concur in the result reached concerning count I of the indictment. I respectfully dissent to the disposition of point of error number fifteen relating to count II. The majority affirmatively states, "We are not willing to abandon our decision in *Fortune v. State*, 699 S.W.2d 706 (Tex.App.—Beaumont 1985, pet. granted)," then apparently follows, not the holding of *Fortune*, but the footnote. If the majority were indeed not abandoning the *Fortune* decision, it would be constrained to sustain the point of error.

The point of error encompasses the ongoing debate concerning *Drake v. State*, 686 S.W.2d 935 (Tex.Crim.App.1985), *Ex parte Siller*, 686 S.W.2d 617 (Tex.Crim.App.1985), and tangentially, *Ex parte McWilliams*, 634 S.W.2d 815 (Tex.Crim.App.), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982). Both *Drake* and *Siller* involved two felony offenses charged in the same indictment. In *Drake*, both convictions stood because the two offenses alleged were different transactions, and since Drake failed to compel the state to elect, he waived any error. In *Siller*, however, the two offenses alleged arose out of the same transaction. Here, the two offenses arose out of the same transaction, also. I would hold, therefore, as *Fortune* did, that the second conviction must be set aside and vacated, *see also Taylor v. State*, 693 S.W.2d 4 (Tex.App.—Beaumont 1985, pet. ref'd) (On Motion for Rehearing), but that since it is void, a retrial may be had. *Ex parte Easley*, 490 S.W.2d 570 (Tex.Crim.App.1972).