Affirmed and Opinion filed December 19, 2002









Affirmed
and Opinion filed December 19, 2002.

 




 
 
 
  
 
 
 




In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-01-01273-CR

____________

 

ROLANDO TORRES, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 248th District Court

Harris County, Texas

Trial Court Cause No. 872,184

 



 

O P I N I O N

Appellant, Rolando Torres, was convicted by a jury of murder
and sentenced to 30 years= confinement in the Institutional Division of the Texas
Department of Criminal Justice. In four issues, appellant contends (1) the
trial court erred in denying his motion for mistrial, (2) the trial court erred
in overruling his objection to testimony, (3) the evidence is factually insufficient
to support the verdict, and (4) the trial court erred in overruling his
objection to the prosecutor=s improper jury argument. 
We affirm.








                                                             I. 
Background

On March 10, 2001, a birthday party
for Fernando Torres was held at the home of Claudia Rodriguez.  Both appellant and complainant, Torin (“Toro”)
Murphy, attended the party.  Appellant
fell asleep on the couch after drinking. 
While appellant was asleep, Rodriguez and Sylvia Pizenia put make-up on
him, painted his fingernails, and tied his shoelaces together.  Toro=s girlfriend, Rosa Delgadillo, wanted
to untie appellant=s shoelaces so he would not fall; this made Toro jealous.

Appellant=s girlfriend, Belinda Cuevas, woke him up.  As appellant and Cuevas were leaving the
party with his girlfriend, appellant said to Toro, “My name is Roland.”  Toro responded, “No, your name is Pussy with
a capital P.”  Appellant did not say
anything in response.  Cuevas does not
remember Toro making an offensive comment to appellant when they were leaving
the party.  However, Cuevas testified
Toro told appellant that another person at the party named Manuel wanted to
fight appellant.  Appellant left the
party upset with Toro because he was trying to get everybody against each
other.  According to Cuevas, appellant
said, “Payback [is] a bitch,” and he would get Toro.  Appellant, however, was not known to fight
back.

At 9:00 p.m. on March 14, 2001, Toro and Delgadillo walked to
the store to buy a soda.  On the way,
they passed by Woody=s Ice House.  Although
Delgadillo did not notice anyone standing outside Woody=s, she observed an older model white
Suburban that passed them three or four times. 
When they were walking back from the store, Delgadillo saw two men
standing against the side wall of Woody=s. 


Delgadillo saw the men follow her and Toro.  Delgadillo then heard gun shots fired behind
her.  Toro screamed and pushed Delgadillo
out of the way.  After the shooting had
stopped, Delgadillo ran to the bar and told the people inside to call the
police.  As she ran into the bar,
Delgadillo saw the shorter man climb into the back of the Suburban.  








According to Delgadillo, one of the men was five feet six
inches tall, skinny, and wearing long blue-jean shorts, and a black sweater
with a hood over his head and white lettering down the length of the
sleeves.  The other man was taller and
wearing a black sweater and blue-jean pants. 
Delgadillo recognized the shorter man as appellant by his sweater, which
she had seen him previously wear, and his skinny legs and knees, which their
friends joked about.  Delgadillo
testified there was enough lighting to see colors and the men=s forms, but not their faces.  Immediately after the shooting, Delgadillo
told the police she thought the shorter man was appellant.  

Appellant arrived at Cuevas= home between 9:30 and 10:00 p.m. on
the same night of the shooting. 
Appellant was standing at the gate; he appeared to be nervous.  Appellant was wearing a gray and black
sweater, jeans, and white and blue tennis shoes.  Cuevas testified that appellant said, “I did
it.”  When Cuevas asked appellant if he
had killed Toro, appellant responded that he and Fernando Torres “got him.”  Cuevas spoke to Delgadillo the following
day.  Delgadillo told her Toro had been
shot.  Cuevas did not admit to Delgadillo
that she already knew Toro had been shot, but instead feigned surprise.  

Later that night, appellant went to the house of David
Gomez.  Appellant woke up Gomez and said
that he “got Toro,” who was the guy who had been messing with him, and made a
gesture like he was shooting someone. 
Gomez had been drinking beer and smoking marijuana and was asleep when
appellant told him about Toro.  Gomez
also asserts that when he gave his statement, the police pressured him by
threatening to keep him at the station.  








After interviewing Delgadillo, Deputy Tracy Shipley of the
Harris County Sheriff=s Department decided that she needed to talk to
appellant.  Shipley and another deputy,
Ronald Hunter, set up a surveillance of appellant=s house.  On March 19, 2002, Shipley and Hunter observed
a gray Lincoln Towncar pulling out of the driveway.  Shipley and Hunter followed the Towncar.  After observing the Towncar running through a
stop sign, Shipley and Hunter radioed a marked patrol unit to make a traffic
stop.  As Shipley and Hunter were
approaching the stopped Towncar, they heard appellant say, without any
prompting, “this [is] about the dude that got shot, Toro.”  Shipley and Hunter asked everyone in the
Towncar to come voluntarily to the station. 


Appellant gave a voluntary written statement in which he
recounted the events that took place between him and Toro at the party.  According to appellant=s statement, Toro told him three
other men at the party wanted to fight him. 
Appellant confronted the men; they told him they did not want to fight
him, but that Toro told them appellant wanted to fight them.  Toro asked appellant if he was “going to let
those dudes get away with that.”  When
appellant told Toro that he had already confronted the men and found out they
did not want any trouble and he was going to drop the issue, Toro called him a
pussy.  Appellant and Cuevas then left
the party.  Appellant stated he neither
killed Toro nor had any knowledge of who killed him.  

Although appellant was free to leave the station after he had
given his first statement, he was asked to stay.  At that point, Shipley wanted to speak to
Cuevas.  After taking Cuevas= statement and considering the
statements of the other occupants of the Towncar, Shipley put appellant in jail
on a 24-hour hold.  

Detective Wayne Kuhlman was in an interview room with
appellant when he noticed what appeared to be blood spatter on appellant=s shoe.  When Kuhlman pointed it out to appellant, he
put his finger in his mouth and began to rub the spot until Kuhlman told him to
stop and take off his shoes.  The
substance on appellant=s shoe tested “presumptive positive” as blood, but no DNA was
detected, possibly because the sample was too small. 

            On March 20, 2001, after Hunter had
given him his Miranda warnings, appellant gave a second written while in
custody.  In his second statement,
appellant admitted his “first statement . . . was not the complete truth” and
further stated:

I am not the triggerman.  It was Fernando.  I know Fernando by my girlfriend=s (Belinda=s)
cousin Sylvia.  Fernando is Sylvia=s boyfriend.  He
drives a maroon 4-dr Pontiac.








On the night Toro was killed, he was just walking with
a husky shaped Hispanic female to the bar (Woody=s Ice
House) or to the gas station that was off the freeway, when all of a sudden
Sylvia who was driving the maroon Pontiac stopped the car on the side of the
street next to the bar.  Sylvia was
driving, Fernando was in the front passenger seat and I was in the back seat.

 

When Sylvia stopped the car, Fernando got out of the
car and all of a sudden shots ranged [sic] out from outside of the car.  I saw Fernando shoot Toro in the back about
five of [sic] six or a little bit more times. 
I got out of the car a short distance along [sic] Fernando.  I could not believe my eyes of what I was
seeing.  I was blank and I had chills in
my body when I saw him shoot Fernando [sic]. 
We hurried back into the car and we left, traveling East on Nimitz
Street.  I don=t think Sylvia knew what was going to happen, because
she was asking Fernando a lot of questions about where we were driving before
the shooting.  He just kept giving her
orders of where to drive.  I did not know
what was going to happen . . . .

Fernando Torres testified he was arrested and charged with
Toro=s murder and spent four months in
jail.  Torres said he had never spoken to
Toro before the birthday party; he talked to Toro about joining Toro=s gang.  Torres testified he was afraid of complainant
the night of the party.  Torres stated
that “in [his] mind [he] thought Toro was sent by the Raza Uneda [sic] gang to
do [him] in.” 

When Torres and appellant were in the same holding cell,
appellant confessed that he had shot Toro and he was sorry he had told the
police Torres had done it.  Torres, an
apprentice plumber, testified he was in a welding class from 5:30 to 9:00 p.m.
on the night of Toro=s murder.  Torres
further testified Sylvia Pizenia, who appellant claims drove the car at the
time of the shooting, does not know how to drive.  

Toro sustained eight gunshot woundsCfour bullets stayed in the body and
four went through the body.  The cause of
death was multiple long-range gunshot wounds. 









                                                   II. 
Factual Sufficiency

In his third issue, appellant
challenges the factually sufficiency of the evidence supporting his
conviction.  When reviewing claims of
factual insufficiency, it is our duty to examine the jury=s weighing of the evidence.  Clewis v. State, 922 S.W.2d 126, 133,
134 (Tex. Crim. App. 1996).  In other
words, we must view the evidence “without the prism of ‘in the light most
favorable to the prosecution’” and set aside the verdict only if it is “so
contrary to the overwhelming weight as to be clearly wrong and unjust.”  Id. at 129.  Thus, when reviewing factual sufficiency
challenges, appellate courts must determine “whether  a neutral review of all of the evidence, both
for and against the finding, demonstrates that proof of guilt, although
adequate if taken alone, is greatly outweighed by contrary proof.”  Johnson v. State, 23 S.W.3d 1, 11
(Tex. Crim. App. 2000).  

Appellant complains there is no physical evidence to tie him
to the murder and that the evidence arguably supporting his guilt is entirely
circumstantial, consisting mostly of nonspecific remarks appellant made to
Cuevas and Gomez that he had “gotten” Toro. 
Appellant further argues there was no motive for him to kill complaint,
but there was evidence Fernando Torres had a motive to kill complainant.  Appellant also claims Gomez and Torres were
coerced into giving their statements. 
Finally, appellant asserts the evidence indicates both of his statements
to the deputies were involuntary.  

We find the evidence is factually sufficient to support appellant=s conviction.  The evidence consists of more than a few
vague remarks by appellant.  Cuevas
testified that appellant told her he would get Toro, and when she asked
appellant if he had killed Toro, he said he and Torres “got him.”  Appellant told Gomez he got Toro while he
simultaneously made a gesture like he was shooting a gun.  Appellant=s remarks were specific, not
vague.  Immediately following the
shooting, Delgadillo identified one of the two men as appellant.  








Appellant gave two statements, the second of which refers to
the first as “not the complete truth,” and places appellant at the scene of the
shooting.  The second statement also
describes trouble that arose between appellant and Toro at a party just a few
days before the shooting, providing a possible motive for appellant.  Moreover, when one of the deputies pointed
out to appellant what appeared to be a possible blood spatter on his shoes, he
immediately tried to rub it out.  That
substance tested “presumptive positive” as blood.  

Appellant claims Torres had a stronger motive to kill Toro
than he.  Torres, however, testified he
was in a welding class the night of the shooting.  Appellant also suggests his written statements
were involuntary.  The trial court,
however overruled his motion to suppress and instructed the jury on the
admissibility of the defendant=s statements.[1]  

The jury is the sole judge of the facts, the credibility of
the witnesses, and the weight to be given the evidence.  Beckham v. State, 29 S.W.3d 148, 152
(Tex. App.CHouston [14th Dist.] 2000, pet. ref=d). 
Therefore, the jury may believe or disbelieve all or part of any witness=s testimony.  Jones v. State, 984 S.W.2d 254, 258
(Tex. Crim. App. 1998).  Reconciliation
of any conflicts in the evidence falls within the exclusive province of the
jury. Heiselbetz v. State, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995).  








The jury was entitled to determine what weight to be given
the evidence and the credibility of the witnesses and whether or not to believe
the testimony of any witness.  By its
verdict, it apparently chose to believe appellant told Cuevas and Gomez that Ahe got@ Toro, i.e., he had killed
him; that Gomez= and Torres= statements were true and not made under duress, and
appellant=s statements were not
involuntary.  Viewing the evidence
without the prism of in the light most favorable to the prosecution, we do not
find the verdict so contrary to the overwhelming weight of the evidence as to
be clearly wrong and unjust.  Appellant=s third issue is overruled. 

                                 III. 
Disposition of Co-defendant=s Case

In his first issue, appellant claims the trial court erred in
denying his motion for mistrial after the prosecutor asked Fernando Torres if
his case had been no-billed and he had been released.  The disposition of a codefendant=s case is generally not admissible in
the trial of another codefendant.  Miller
v. State, 741 S.W.2d 382, 389B90 (Tex. Crim. App. 1987); Rodriguez
v. State, 552 S.W.2d 451, 454B55 (Tex. Crim. App. 1977); Morales
v. State, 11 S.W.3d 460, 465B66 (Tex. App.CEl Paso 2000, pet. ref=d); Beasley v. State, 838
S.W.2d 695, 703 (Tex. App.CDallas 1992, pet. ref=d). 


The prosecutor elicited testimony from Torres that he had
been arrested and charged with Toro=s murder and had spent four months in
jail on that charge.  The prosecutor then
asked appellant, “And at some point was your case no billed by the Grand Jury
and you were released?”  The trial court
sustained appellant=s objection and instructed the jury to disregard that
question, but denied appellant=s motion for mistrial. 








The denial of a motion for mistrial is reviewed under the
abuse of discretion standard. Trevino v. State, 991 S.W.2d 849, 851
(Tex. Crim. App. 1999).  A mistrial is
required only when “the question is ‘clearly calculated to inflame the minds of
the jury and is of such a character as to suggest the impossibility of
withdrawing the impression produced on their minds.’”  Moore v. State, 882 S.W.2d 844, 847
(Tex. Crim. App. 1994) (quoting Gonzalez v. State, 685 S.W.2d 47, 49
(Tex. Crim. App. 1985)).  A trial court
does not abuse its discretion when its decision is at least within the zone of
reasonable disagreement.  Montgomery
v. State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990).  Asking an improper question will rarely
require a mistrial,[2]
and an instruction to disregard will cure error associated with an improper
question and answer in most cases.[3]  An instruction to disregard evidence of the
disposition of a co-defendant=s case is usually sufficient to cure any error.  Morales, 11 S.W.3d at 466; Beasley,
838 S.W.2d at 703.  

Appellant argues the prosecutor was attempting to inflame the
jury by suggesting appellant had lied in his statement by placing blame on
Torres whom the grand jury found to be innocent.  Appellant contends the prosecutor=s question was harmful for two
reasons. First, appellant maintains the evidence of his guilt merely consists
of inferences from ambiguous remarks he allegedly made to Cuevas and Gomez that
he “got” complainant, with no physical evidence to tie him to the murder.  Second, appellant argues the prosecutor=s question was clearly calculated to
refute evidence that Torres had a strong motive to kill complaint because he
testified he was afraid of complainant and his gang.  

Appellant=s second statement established that appellant had already
lied in his first statement and it placed him at the scene of Toro=s murder.  Torres testified he was in a welding class
the night of the shooting in addition to testifying about his fear of Toro and
his gang.  We have already determined
that evidence of appellant=s guilt consists of more than ambiguous remarks made to
Cuevas and Gomez and is sufficient to support appellant=s murder conviction.  Therefore, we hold the instruction to
disregard cured any error and the trial court did not abuse its discretion in
overruling appellant=s motion for a mistrial. 
Appellant=s first issue is overruled. 


                                              IV. 
Complainant=s Remarks








In his second issue, appellant claims the trial court erred
in overruling his objection to Delgadillo=s testimony about statements Toro
made to her after the shooting. 
Delgadillo testified during the guilt-innocence stage of the trial that
after the shooting complainant told her that he loved her.  

Nonconstitutional error that does not affect substantial
rights must be disregarded.  Tex. R. App. P. 44.2(b). 
Substantial rights are not affected by the erroneous admission of
evidence if the appellate court, after reviewing the record as a whole, has
fair assurance that the error did not influence the jury, or had but a slight
affect.  Solomon v. State, 49
S.W.3d 356, 365 (Tex. Crim. App. 2001). 
In determining whether the jury=s decision was adversely affected by
the error, the Court of Criminal Appeals has instructed that we should consider
everything in the record, including any testimony or physical evidence admitted
for the jury=s consideration, the nature of the
evidence supporting the verdict, the character of the alleged error and how it
might be considered in connection with the other evidence.  Morales v. State, 32 S.W.3d 862, 867
(Tex. Crim. App. 2000).  Evidence of an
appellant=s guilt is also a factor for
consideration in the harm analysis conducted by the reviewing court.  Motilla v. State, 78 S.W.3d 352, 358
(Tex. Crim. App. 2002).  

Appellant contends that whether Toro loved Delgadillo is not
relevant to his guilt or innocence, but rather, the only purpose in having
Delgadillo testify about Toro=s statement is to evoke sympathy from the jury and to reach a
guilty verdict based on that sympathy. 
Appellant asserts that because the evidence of his guilt is
circumstantially weak, it cannot be said that the error had no effect, or a
slight effect, on the jury=s verdict.








Appellant relies on this court=s decision in Motilla v. State
in support of his contention.  38 S.W.3d
821 (Tex. App.CHouston [14th Dist.] 2001), rev=d, 78 S.W.3d 352 (Tex. Crim. App. 2002).  In Motilla, the trial court overruled
the defendant=s objection to testimony that the
complainant was adopted and had a twin brother. 
Id. at 826.  On appeal,
this court held the testimony was not relevant, but instead was an attempt to persuade
the jury to base its verdict of murder on sympathy and reversed the conviction
because we could not conclude the error had no effect, or but a slight effect,
on the jury=s verdict.  Id. at 827.  After conducting its own harm analysis, the
Court of Criminal Appeals reversed this court=s decision and affirmed the judgment
of the trial court, finding the testimony was irrelevant, but harmless.  Motilla, 78 S.W.3d at 360.  

Whether Toro loved Delgadillo is not relevant to appellant=s guilt.  However, the trial court=s error in admitting that testimony
is harmless.  The evidence supporting the
jury=s guilty verdict is far from Aweak.@ 
Moreover, the State did not emphasize the error because no reference was
made to that testimony in closing arguments. 
See Motilla, 78 S.W.3d at 359. 
Appellant=s second issue is overruled.

                                              V. 
Prosecutor=s Argument

In
his fourth issue, appellant claims the trial court erred in overruling his
objection to the prosecutor=s improper closing argument in the punishment stage of the
trial that asked the jurors to put themselves in the place of the victim.  During the punishment hearing, the State=s attorney made the following
argument:

In thinking about what to do with this defendant, I
want you to think of the last few moments that Torin was alive because that is
appropriate.  Rosa told you that she just
remembers hearing him scream.  You know
he was in pain.

I think it is very easy in the course of a trial to
hear evidence in a very antiseptic, sort of unemotional way, and for  a moment before you decide what to do with
this defendant, I want you to close your eyes and think of how that young man
felt.

[APPELLANT=S
COUNSEL]:  I object to the prosecutor
asking the jury to place themselves in the position of the decedent in this
case.  I think that=s irrelevant and objectionable.

THE COURT: 
Overruled.

[THE STATE=S
ATTORNEY]:  Don=t you know he was scared?  Don=t you
know he said to her, [“]Don=t leave me. 
Please don=t let me die.  I
love you.[”]  Nobody should have to die
that way and that is worthy of your consideration.








The four permissible areas of jury argument are (1) summation
of the evidence; (2) reasonable deductions from the evidence; (3) answer to the
argument of opposing counsel; and (4) plea for law enforcement.  Guidry v. State, 9 S.W.3d 133, 154
(Tex. Crim. App. 1999).  Appellant
contends the prosecutor=s argument fell outside the permissible areas of jury
argument; the State contends the argument was a legitimate plea for law
enforcement.

Several
courts have held that arguments similar to the one made here are improper.  For example, in Brandley v. State, 691
S.W.2d 699, 712 (Tex. Crim. App. 1985), before being cut off by an objection,
the prosecutor argued:

I think you can see from the evidence, from some of
the photographs, there is a look of stark terror in the photographs seen on her
[the decedent=s] face.  It is
fair for you to think about the feelings of the father who lost his baby
daughter and it is fair for you to think about how you would feel if you lost
your children in considering . . . .

 

Initially, the prosecutor asked the jury, without objection, to consider
the victim=s terror.  As such, part of the argument in Brandley
is very similar to one made here.  In Brandley,
however, the prosecutor continued by asking jurors to imagine how they would
feel if they had lost a daughter. The Court of Criminal Appeals held the
argument was improper because it was essentially a plea for abandonment of objectivity.  Id.

Likewise,
in Boyington v. State, 738 S.W.2d 704, 709 (Tex. App.CHouston [1st Dist.] 1985, no pet.),
the State=s attorney asked the jury to assess
the same punishment they would want to inflict upon the defendant if the
offense had been committed against them:








If you are going to go back there and show leniency,
that=s fine.  But
please have a good reason for it. 
Because what would you do if this happened to your family?  You know, all of you have got families here
and you have got kids and you have got a home. 
How would you feel if your home was firebombed one night and you saw
your children on fire?  What do you think
should happen to a person like Barron Lee Boyington, that does something like
that?  And it is your opportunity to say,
ABarron Lee Boyington, you have no right to do what you
did to that Anderson family, and we aren=t going to put up with it.@  So please put
yourself in that place when you are deciding this.  Put yourself in the place of that Anderson
family and imagine that was your family that was firebombed in the middle of
the night.  Imagine that it was your son
that has his legs on fire.  Imagine that
it was your home that was burned out. 
Would you want mercy shown?  Would
you want leniency shown?  . . . .

And please keep in
the forefront of your mind just like it was your family that received the fire
bomb and you are in a den at 3:00 a.m. on a hot summer evening.  Keep that in the forefront of your mind and
just think what you would want to happen in that situation.

 

The Court of Appeals held this argument could only have been designed to
inflame the passions of the jury and, as such, was manifestly improper.  Id.

The argument made here, however, is distinguishable from the
arguments made in Brandley and Boyington.  In both of those cases, the prosecutor sought
to have jurors assess the same punishment they would want to impose upon the
defendant if the offense had been perpetrated against them personally.  The difficulty with this argument is that
victims frequently, and understandably, long for vengeance far out of
proportion to the severity of the offense. 
It is precisely this aspect of human behavior that led to ancient blood
feuds, and it was the need to suppress the destructive nature of blood feuds
that led to the evolution of much of our English law.[4]  Thus, it is the law=s objective to assess a reasoned,
rational, and just punishment that the fits both the crime and the
offender.  








Today, the Sixth Amendment of the United States Constitution
and article I, section 10 of the Texas Constitution guarantee the accused the
right to a fair trial before an impartial jury. 
Howard v. State, 982 S.W.2d 536, 539 (Tex. App.CSan Antonio 1998, pet. dism=d). 
It is this guarantee of impartiality that prohibits a witness, and thus
a victim, from serving as a juror and imposing punishment upon the defendant.  See Tex.
Code Crim. Proc. Ann. art. 35.16(a)(6) (Vernon 1989).  In fact, a juror may not even be related to
the victim within the third degree of consanguinity or affinity.  Tex.
Code Crim. Proc. Ann. art. 35.16(c)(1) (Vernon Supp. 2002).  Thus, in Brandley and Boyington,
the prosecutor sought to do by imagery and speculation what the law prohibits
in fact, i.e., have the defendant=s punishment assessed by the victim
of the crime, or at least assessed by a jury who will endeavor to assess the
same punishment the victim would impose.

But while punishment, in our modern system of criminal
justice, must be based upon the moral blameworthiness of the defendant (and not
the victim=s desire for revenge), the jury is
still entitled to consider the full, unvarnished  specter of the defendant=s actions.  Evidence of the victim=s physical, mental, or pecuniary injury
is highly relevant when considering the full magnitude of the crime.  Moreover, the human mind is incapable of
making any subjective judgment, perhaps even any rational decision, without
reference to personal experience.[5]  In evaluating the heinousness of an offense,
each juror must necessarily rely upon his own feelings, emotions, and
experiences because there is no other criterion by which he or she can evaluate
the facts.  The genius of the jury
system, however, is that the individual perspectives of twelve jurors are
blended into one punishment verdict.








Here, the jury was asked to make reasonable deductions from
the evidence regarding the degree of terror and pain experienced by the
complainant shortly before his death. 
This is entirely appropriate.  For
example, in Williams v. State, 732 S.W.2d 762, 765 (Tex. App.CBeaumont 1987, no pet.), the State=s attorney argued in an aggravated
sexual assault case:  “The pain and the
anguish and the terror that she [the victim] has will remain in her heart and
mind for as long as she lives.”  Of
course, a juror can only appreciate the degree of pain and anguish experienced
by the victim by considering how he or she would feel in the same
situation.  Nevertheless, the Court of
Appeals held the argument to be a reasonable deduction from the evidence, based
upon the victim=s testimony, that she would be emotionally scarred as a
result of the sexual assault.  However,
the court held the prosecutor erred when he thereafter argued, “Place
yourselves in the shoes of the victim, the most personal violation of her
body.  How would you feel?  What would you want?”  Id. (emphasis added).  The distinction between fully appreciating
the victim=s pain and suffering, on the one
hand, versus how the victim would want the defendant punished, on the other, is
a subtle, but important distinction.  In
the first instance, the prosecutor is merely summarizing the evidence, making a
reasonable deduction from the evidence, or making a legitimate plea for law
enforcement.  In the second instance, the
prosecutor is asking the jury to assess punishment not on impartial objective
notions of justice, but upon personal passion accelerated by the outrage every
human being naturally feels toward one who has wrongfully caused him pain,
embarrassment, grief, or loss.

This
distinction was recognized by the First Court of Appeals in Linder v. State,
828 S.W.2d 290, 303 (Tex. App.CHouston
[1st Dist.] 1992, pet. ref=d).  There the State=s attorney argued made the following
argument:








Can you imagine what it=s like
to know that someone has gone into your home . . .  Imagine what it=s like
and what kind of person it takes to go back and pick up an innocent defenseless
woman whose son is sleeping right next to her . . .  Can you imagine what it was like to be that
woman?  . . .  You wake up. 
You don=t know what=s going
on . . . .  Oh, my God.  What=s
happening?  . . .  Who is this man coming into your home?  . . . 
Your four year old son comes to your head and he=s got his arms around your head and you=re terrified that something will happen to your son.

 

Id.  The court distinguished the arguments made in
Brandley and Boyington, noting that in those cases the prosecutor
“directly and explicitly urged the jury to punish the defendant as if he had
actually attacked them and their families.” 
The court observed, however, that in Linder, the prosecutor=s review of the evidence focused only
on the actions of the defendant and the experience described by the victim in
her testimony.  As such, the court held
the argument was a proper summation of the evidence.  Id.

We realize that not every court in Texas has recognized the
distinction between properly asking the jury to place themselves in the
shoes of the victim to understand the pain, injury, or loss suffered by the
victim versus improperly asking the jury to place themselves in the
shoes of the victim to consider what punishment the victim would want to impose
upon the defendant.[6]  However, we have found no controlling
authority refuting such a distinction. 
Moreover, we find the rationale articulated in Linder to be very
persuasive.








Like
the First Court of Appeals, we note that the Louisiana Supreme Court has also
abolished any per se prohibition of asking jurors to imagine themselves in the
shoes of the victim.  In State v.
Moore, 432 So.2d 209 (La.), cert. denied, 464 U.S. 986 (1983), the
prosecutor asked the jury to feel the fear experienced by the victim shortly
before his death.[7]  The court first observed that all of the
remarks and observations made by the prosecutor could be reasonably deduced
from the evidence.  The court then wrote:

It is not beyond
the scope of normal human behavior and experience to imagine one=s self in the shoes of a crime victim, and it is not
inconceivable that many, if not all, of the jurors in this case, in viewing the
evidence adduced at trial, took into account the emotions experienced by the
victim prior to his death in rendering their verdict and penalty
recommendation.  We cannot view the
prosecutor=s argument in any vein other than as an appeal to the
jury to apply their general knowledge and experience to the evidence adduced at
trial before rendering their recommendation, and we are hereby unwilling to
establish a rule which would per se prohibit the state from asking jurors to
place themselves in the shoes of the victim. 
While it is the function of this court to ensure that criminal
defendants do not fall prey to a Alynch
mob@ mentality, we cannot expect jurors to be cold
machines devoid of human emotion.  We are
of the opinion that the prosecutor=s
request was sufficiently confined to the evidence and any permissible
inferences which could have been fairly drawn therefrom within the meaning of La.C.Cr.P. art. 774. 
We are likewise of the view that the request did not inject into the
penalty proceeding any undue passion, prejudice or other arbitrary factor which
unfairly influenced the jury=s recommendation that the defendant be sentenced to
death.

Id. at 222.








Likewise, we find the argument made here was a reasonable
deduction from the evidence and a proper plea for law enforcement.[8]

Moreover, even if we were to assume that the argument
constituted error, such error would be harmless.  The alleged error here does not rise to the
level of constitutional error.  Martinez
v. State, 17 S.W.3d 677, 692 (Tex. Crim. App. 2000).  In such cases, determining harm requires a
balancing of the following factors: (1) severity of the misconduct (the
magnitude of the prejudicial effect caused by the State=s improper jury argument), (2)
curative measures (the effectiveness of any cautionary instruction given by the
trial court), and (3) certainty of conviction absent the misconduct (the
strength of the evidence supporting the conviction).  Mosely v. State, 983 S.W.2d 249, 259
(Tex. Crim. App. 1998).  Because the
argument occurred during punishment, the third factor is accordingly
modified.  Martinez, 17 S.W.2d at
692B93. 









We do not find the degree of misconduct, if any, to be so
severe as to have had a prejudicial effect. 
The prosecutor=s comments were but only a small portion of the State=s argument at punishment. The
prosecutor commented on the fact that there was nothing in appellant=s background to explain his
committing this crimeChe had no history of drug or alcohol abuse, he came from a
good home with no history of physical abuse, and he had supportive parents who
tried to instill in him strong morals and values.  The prosecutor further commented to the
jurors that they should be concerned that appellant could be capable of such
violence at age twenty.  The prosecutor
also recounted the brutality with which appellant committed the murderCambushing Toro, shooting Toro in the
back, and bragging about it.  The jury
assessed a sentence of thirty years, which is well within the punishment range
of five to ninety-nine years or life for a first-degree-felony offense.  Tex.
Pen. Code Ann. ' 12.32 (Vernon 1994).

Thus,
while we find the prosecutor=s statement was a proper argument, even if we were to
conclude otherwise, the error would be harmless.  Appellant=s fourth issue is overruled, and the
judgment of the trial court is affirmed. 


 

 

 

 

 

/s/        J. Harvey Hudson

Justice

 

 

 

 

 

 

Judgment rendered
and Opinion filed December 19, 2002.

Panel consists of
Chief Justice Brister and Justices Hudson and Fowler.

Publish C Tex.
R. App. P. 47.3(b).











[1]  To the extent
appellant claims on appeal that his written statements were involuntary, he has
not raised this as a separate issue and has provided no argument or authority,
thereby waiving any complaint on appeal. 
Tex. R. App. P. 38.1  Even if his statements were involuntary, the
evidence is nonetheless factually sufficient to support his conviction for
murder.  





[2]  Moore,
882 S.W.2d at 847.





[3]  Ovalle
v. State, 13 S.W.3d 774, 783 (Tex. Crim. App.
2000); Fuller v. State, 827 S.W.2d 919, 926 (Tex. Crim. App. 1992).  





[4]  AIt is commonly known that the early forms of legal
procedure were grounded in vengeance. 
Modern writers have thought that the Roman law started from the blood
feud, and all the authorities agree that the German law begun in that way.  The feud led to the composition, at first
optional, then compulsory, by which the feud was bought off.  The gradual encroachment of the composition
may be traced in the Anglo-Saxon laws, and the feud was pretty well broken up,
though not extinguished, by the time of William the Conqueror.@  Oliver Wendell Holmes, Jr., The Common Law 2
(1881).  Thus, the original purpose of
criminal law was to bring peace to the realm by supplanting the blood feud with
a system acceptable to the victim or his kin, thus avoiding the high social
costs of blood feuds.  See United
States v. Vaknin, 112 F.3d 579, 582 (1st Cir. 1997); Jeremiah B. v.
State, 823 P.2d 883, 885 (Nev. 1991).





[5]  Judges, for
example, must routinely look to their personal experience when making such
subjective judgments.  See Montgomery
v. State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh=g) (determining the relevancy of evidence); Missouri
Pac. R.R. Co. v. Alderete, 945 S.W.2d 148, 150 (Tex. App.BSan Antonio 1996, no writ) (determining the
appropriateness of ad litem fees); Star Houston, Inc. v. Kundak, 843
S.W.2d 294, 299 (Tex. App.CHouston [14th Dist.] 1992, no writ) (determining the
reasonableness of attorney fees).





[6]  In Chandler
v. State, 689 S.W.2d 332, 334 (Tex. App.CFort
Worth 1985, pet. ref=d), the court made the blanket assertion that A[i]t is improper in argument for a prosecutor to ask
members of the jury to place themselves in the shoes of the victim.@





[7]  The
prosecuting attorney made the following argument:

Think of
the fear that was then present for a man that was going to see his wife, but
then he=s a victim of a crime. 
Watch Mr. Austin get in the car, being shoved in.  Watch him being held down.  Feel what he felt from the evidence from
being held in place with people on both sides, armed with weapons, seeing help
just a little bit away, the Deputy Sheriff=s car,
without being able to call out and not being able to get a message off.  . . .

Continue
on for approximately three more miles to the scene at Burma Road.  Held in the back seat.  Feel the thoughts.  Feel the feelings.  All I have is four kids and a wife that I
want to go home to.  I never asked for
this.  The car stops, he=s pushed out, walked out . . .  Mr. Austin is not here to tell us what
happened, but we know one thing.  He=s shot in the back. 
Shot in the back and left to die by bleeding to death.

Death isn=t pretty.  It wasn=t pretty that night at the scene when I walked up
there, but I=m asking you to look at something because I don=t know how close you looked at it, but as he lay there
in the ditch, he has the face of death. 
The victim knew he was dying. 
Shot and bleeding to death from the gunshot wound administered to him by
the defendant and his co-defendants. 
That=s fear.  That=s pain.  That=s suffering.

Id. at 221.





[8]  Because the
prospect of jury nullification is always a possibility, a prosecutor does not
err in making a plea for law enforcement at the guilt/innocence phase of the
trial.  See, e.g., Mulder v. State,
707 S.W.2d 908, 913 (Tex. Crim. App. 1986); Martinez v. State, 826
S.W.2d 807, 808 (Tex. App.CTexarkana 1992, no pet.).  However, the logical relevance of a plea for
law enforcement is greatest at the punishment phase of the trial.